969 F.2d 1169
 Nuclear Reg. Rep. P 20,556, 297 U.S.App.D.C. 169,
22 Envtl. L. Rep. 21,252
 NUCLEAR INFORMATION RESOURCE SERVICE, et al., Petitioners,
v.
NUCLEAR REGULATORY COMMISSION and United States of America,
Respondents,
Nuclear Management and Resources Council, Inc., Intervenor.
 No. 89-1381.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 20, 1991.
Decided July 17, 1992.
 
 Eric R. Glitzenstein, with whom Katherine A. Meyer was on the brief, for petitioners. William B. Schultz, Alan B. Morrison, Dean R. Tousley, Diane Curran, and James M. Shannon also entered appearances for petitioners.
 John F. Cordes, Jr., Solicitor, Nuclear Regulatory Com'n, with whom Barry M. Hartman, Acting Asst. Atty. Gen., Ellen J. Durkee, Atty., Dept. of Justice, William C. Parler, Gen. Counsel, E. Leo Slaggie, Deputy Sol., and Carole F. Kagan, Senior Atty., Nuclear Regulatory Com'n, were on the brief, for respondents. Richard B. Stewart, Asst. Atty. Gen., John A. Bryson, Atty., Dept. of Justice, Martin G. Malsch, and Steven F. Crockett also entered appearances for respondents.
 Marcus A. Rowden, with whom P. David Richardson, Barton Z. Cowan, Joseph M. Ramirez, and Robert W. Bishop were on the brief, for intervenor. Arthur Lazarus, Jr., also entered an appearance for intervenor.
 Dorothy Thompson and Robert Guild entered appearances for amici curiae.
 Before MIKVA, Chief Judge; WALD, EDWARDS, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.*
 Opinion for the Court filed by Circuit Judge SENTELLE.
 Dissenting opinion on the denial of a pre-operational hearing on new safety information filed by Circuit Judge WALD, with whom Chief Judge MIKVA and Circuit Judge HARRY T. EDWARDS join.
 Opinion concurring in part and dissenting in part filed by Circuit Judge BUCKLEY.
 SENTELLE, Circuit Judge:
 
 
 1
 We today review en banc a Nuclear Regulatory Commission ("NRC" or "Commission") rule aimed at substantially revamping the licensing process for nuclear power plants. 10 C.F.R. Part 52. This matter was previously heard by a panel of this Court in Nuclear Information and Resource Service v. United States NRC, 918 F.2d 189 (D.C.Cir.1990) ("NIRS ").
 
 
 2
 The panel concluded that the Commission's decision in Part 52 to authorize issuance of a single, "combined license" in lieu of separate construction and operating permits was acceptable under the Atomic Energy Act ("Act" or "AEA"). It likewise upheld the Commission's reliance on a pre-approval process for assessing reactor designs and sites. The panel did, however, declare facially invalid Part 52's regulations regarding the Commission's duties in making findings and holding hearings after construction is completed and before operation begins.
 
 
 3
 After rehearing, we continue to affirm the Commission's combined license procedures and its reliance on the pre-approval process; however, we now also hold that the post-construction procedures embodied in Part 52 are based on a permissible reading of the AEA.[1]
 
 I.
 
 4
 Before conducting the rulemaking now before us, the NRC licensed nuclear reactors in two regulatory steps. See 10 C.F.R. Part 50. At the first step, the Commission was required to find the proposed site and preliminary design plans acceptable, and conduct a public hearing on these matters; thereafter, the Commission issued a construction permit. Upon completion of construction, the licensee then sought an operating license, which could be granted only after the Commission approved the reactor's final design, made several other findings, and conducted another public hearing.
 
 
 5
 Because Part 50 allowed the NRC to issue a construction permit on incomplete design information, it often became necessary for the Commission to impose new regulatory requirements as construction continued and plans changed. A "design-as-you-go" approach on the part of licensees was mirrored by a "regulate-as-you-go" tack on the part of the Commission. The result of this regimen was, as the Office of Technology Assessment has stated, that
 
 
 6
 [e]ssentially every reactor ... has been custom-designed and custom-built. The fact that almost every reactor is "one of a kind" has led to excessive difficulty in verifying the safety of individual plants and identifying particular problems in transferring the safety lessons from one reactor to another.
 
 
 7
 Congress of the United States, Office of Technology Assessment, Nuclear Power Plant Standardization at 3 (1981).
 
 
 8
 After a number of unsuccessful attempts to persuade Congress to restructure the licensing process through new legislation, in 1987 the Commission moved to reform reactor licensing regulations under existing legislation. It did so with two announced objectives: to standardize nuclear power plant design, and to establish a procedural framework for resolving with some finality as many safety and environmental issues as possible before--rather than after--construction begins. See 52 Fed.Reg. 34,884 (1987). In 1989, the Commission announced its final product, known collectively as Part 52. 54 Fed.Reg. 15,372 (1989) (codified at 10 C.F.R. Part 52).
 
 
 9
 Pre-Approval of Designs and Sites. One major feature of Part 52 is the NRC's new regulatory scheme for pre-approval of standardized power plant designs by rulemaking. 10 C.F.R. Part 52, Subpart B. Under Subpart B, an applicant files with the Commission a proposed design; if, after a period of notice and comment and a possible hearing, the Commission concludes that the design is safe, it issues a design certification. 10 C.F.R. §§ 52.41-.63. This certification remains effective for 15 years, and is renewable in successive rulemakings. 10 C.F.R. §§ 52.57-.61. Thus, the procedure allows applicants to register a "generic" design with the Commission that may be utilized any number of times during the life of the certification.
 
 
 10
 Related to the pre-approval process for plant designs is one for the early determination of plant sites. 10 C.F.R. Part 52, Subpart A. Under the "early site permit" process, the Commission may, after conducting a hearing and making necessary findings, approve a site permit. 10 C.F.R. §§ 52.11-.39. While a site permit does not authorize construction, it does establish design criteria for plant construction on the proposed site. Moreover, it retains validity for up to 20 years, though the NRC may extend this period after another examination. 10 C.F.R. §§ 52.29-.33.
 
 
 11
 Combined Licenses. Part 52 also establishes a process by which an applicant may obtain a "combined license." 10 C.F.R. Part 52, Subpart C. A combined license constitutes not only a construction permit, but also a conditional operating permit. Issued before construction, it forms the centerpiece of the Commission's effort to resolve as many issues as possible as early in the licensing process as possible. See 54 Fed.Reg. at 15,373-74 (1989).
 
 
 12
 The Commission requires an applicant for a combined license under Part 52 to provide a much higher level of detail concerning the final design of the facility than was needed for a construction permit under Part 50. Before issuing the new combined license, the Commission must find that the proposed final design complies with the Act and NRC regulations; it must also hold a hearing on all related issues. 10 C.F.R. §§ 52.79, 52.85, 52.97. If, however, a combined license application references a pre-approved design, issues regarding design will be deemed resolved; the Commission will conduct no new findings regarding the design and the required hearing will not encompass issues heard at the design certification stage. Id.
 
 
 13
 Even if referencing a pre-approved design, the applicant must still show at this stage that the certified design can be successfully linked to site-specific design elements. Id. The Commission is obliged to hold hearings and make findings on this linkage. Id. If, however, the combined license application references not only a pre-approved design, but also a pre-approved site, the applicant need only demonstrate at this stage that the design falls within the parameters specified in the early site permit. Consequently, the Commission's duty to hold hearings and conduct findings will be limited to this issue. Id.
 
 
 14
 In addition to the foregoing, the Commission must also set forth the "acceptance criteria" for the proposed plant at this juncture. 10 C.F.R. § 52.97(b). Acceptance criteria are the tests, inspections, and analyses the Commission will conduct after construction is completed to ensure that the facility has been built and will operate in conformance with the license and the Act. Id. The content of the acceptance criteria is subject to litigation in the combined license hearing. If any changes are required after the combined license is issued, the Commission must hold more hearings and make further findings before issuing a license amendment; all license amendments must be approved before operation may commence. Id.
 
 
 15
 Post-Construction Procedures. After construction is complete, the Commission--having approved the design and site, and having approved the match between the design and site--treats every licensing issue as finally resolved, save whether the plant as actually built meets the specifications established by the acceptance criteria. Consequently, under § 52.103(b)(1)(i) the Commission will entertain only petitions showing "prima facie, that one or more of the acceptance criteria in the combined license have not been met and, as a result, there is good cause to modify or prohibit operation." If a prima facie case is made out, and certain other requirements met, a formal hearing on conformance to the acceptance criteria will be held. See §§ 52.103(b)(1)(i) and (2)(i). At the end of this hearing, the Commission must, under § 52.103(c), find that "the acceptance criteria ... have been met and ... accordingly, the facility has been constructed and will operate in conformity with the Atomic Energy Act." (Emphasis added.)
 
 
 16
 In sum, Part 52's post-construction procedures limit the NRC's role to determining whether the plant was constructed as its license required; it is not to revisit issues settled at prior stages in the regulatory process, but to rely on the hearings held and findings made at those stages. In this regard, the post-construction procedures parallel the combined license procedures where, again, the Commission treats issues addressed at the pre-approval step as finally resolved.
 
 
 17
 Nonetheless, the Commission does make available after construction a mechanism for the rehearing and reconsideration of the terms and conditions of the combined license itself. See 10 C.F.R. §§ 52.103(b)(1)(ii) and (2)(ii). Anyone may file a petition with the Commission discussing any issue affecting a license's continuing validity. The Commission is obliged to consider whether any immediate action is required and respond to any petition it denies with a written statement of reasons. Id.
 
 II.
 A.
 
 18
 Petitioners object to the combined license and the early approval procedures in Subparts A and B. They assert that these new regulations run afoul of the plain language of § 185 of the AEA which evidences Congress's intent to mandate statutorily the traditional two-step licensing process. The panel rejected this reading of § 185, holding instead each of these innovations acceptable under the Act. NIRS, 918 F.2d at 192-93 & n. 14. After rehearing, we continue to adhere to this conclusion and, consequently, have no reason to revisit petitioners' arguments on this score.
 
 B.
 
 19
 Petitioners next object to the Commission's proposed post-construction procedures. Specifically, they complain of the Commission's reliance on pre-construction rulemakings and hearings to winnow down the issues to be heard and resolved after construction. They contend that the post-construction hearing opportunity must, as the Act is presently written, allow a full opportunity to revisit material design, siting, and other issues discussed at the pre-approval or combined license stages. Therefore, § 52.103(b), allowing a formal hearing only on issues relating to compliance with the acceptance criteria, is facially invalid. Likewise, they argue that the Act requires the NRC to make fresh findings on any and all issues after construction is completed. Thus, § 52.103(c), permitting the Commission to find simply that the acceptance criteria are met and the AEA is "accordingly" satisfied, also trenches upon the Act's dictates. The panel adopted petitioners' position, see NIRS, 918 F.2d at 194-97, invalidating §§ 52.103(b) and (c).
 
 
 20
 We today reexamine these questions, applying the principles set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) ("Chevron"). Under the Chevron analysis, judicial review of an agency's interpretation of a statute under its administration is limited to a two-step inquiry. At the first step, we inquire into "whether Congress has directly spoken to the precise question at issue." Id. at 842, 104 S.Ct. at 2781. If we can come to the "unmistakable conclusion that Congress had an intention on the precise question at issue," State of Ohio v. United States Dep't of Interior, 880 F.2d 432, 441 (D.C.Cir.1989), our inquiry ends there; this Court naturally "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 843, 104 S.Ct. at 2781-82.
 
 
 21
 However, if the statute before us is "silent or ambiguous with respect to the specific issue," before us, we proceed to the second step. Id. At this stage, we "defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose," Chemical Manufacturers Ass'n v. EPA, 919 F.2d 158, 162-63 (D.C.Cir.1990); we are not free to "impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation." Chevron, 467 U.S. at 843, 104 S.Ct. at 2781-82 (footnote omitted). We now turn to review the NRC's regulations under the Chevron rubric.
 
 
 22
 Chevron Step I. Section 189(a) of the Act contains the Commission's statutory instructions concerning the need for, and conduct of, hearings in the licensing process. It provides in pertinent part that
 
 
 23
 [i]n any proceeding ... for the granting, suspending, revoking, or amending of any license or construction permit ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding.... In cases where such a construction permit has been issued following the holding of a hearing, the Commission may, in the absence of a request therefor by any person ... issue an operating license.
 
 
 24
 42 U.S.C. § 2239(a)(1).
 
 
 25
 While this section plainly requires a "hearing upon request" before the "granting" of a license, it provides no unambiguous instruction as to how the "hearing" is to be held; nor does it speak in any direct fashion to the question of whether the Commission must rehear issues already resolved at earlier stages in the licensing process. As we noted in Union of Concerned Scientists v. NRC, 920 F.2d 50, 53-54 (D.C.Cir.1990) ("UCS II "):
 
 
 26
 [t]he [Atomic Energy] Act itself nowhere describes the content of a hearing or prescribes the manner in which this "hearing" is to be run. ... We are, of course, obliged to defer to the operating procedures employed by the agency [i.e. move to a Chevron step II analysis] when the governing statute requires only that a "hearing" be held. See, e.g., American Trucking Ass'ns v. United States, 627 F.2d 1313, 1319 n. 20, 1321 (D.C.Cir.1980) (noting that such "operating procedures" fall "uniquely within the expertise of the agency"); see also Richardson v. Wright, 405 U.S. 208, 209, 92 S.Ct. 788, 789-90, 31 L.Ed.2d 151 (1972); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143-44, 60 S.Ct. 437, 441-42, 84 L.Ed. 656 (1940).
 
 
 27
 (Emphasis added.) In sum, the term "hearing" as it is used in § 189(a) gives this Court no plain textual authority to reject the Part 52 hearing scheme.
 
 
 28
 Petitioners themselves do not rest upon the express language of § 189(a) in protesting the validity of § 52.103(b). Rather, they turn to our prior precedent, pointing specifically to Union of Concerned Scientists v. NRC, 735 F.2d 1437 (D.C.Cir.1984) ("UCS I "), for the proposition that "[w]hen a statute requires a 'hearing' in an adjudicatory matter, such as licensing, the agency must generally provide an opportunity for submission and challenge of evidence as to any and all issues of material fact." Id. at 1444. Reading the phrase "any and all issues of material fact" to require a post-construction hearing on any and all possible material issues, including those already heard at earlier points in the licensing scheme, petitioners reason § 52.103(b) to be invalid.
 
 
 29
 This reading of UCS I misconstrues the language and purpose of the case. UCS I did not require every hearing in the licensing process to encompass every material issue of fact. Rather, as UCS II made clear, UCS I "stands for the proposition that Section 189(a) prohibits the NRC from preventing all parties from ever raising in a hearing on a licensing decision a specific issue it agrees is material to that decision." 920 F.2d at 54 (emphasis added).[2] Taking this view of the UCS I 's requirements, the Commission's post-construction hearing regulations pose no problem. Under Part 52, parties are uncontestably permitted their day in court on every material issue at some point in the licensing process.[3]
 
 
 30
 It is unlikely that we could validly read UCS I to require every material issue to be revisited at the post-construction hearing in light of Supreme Court decisions explicitly permitting agency reliance on prior rulemakings when a "hearing" is required. See generally discussion of Heckler v. Campbell, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) and cases cited therein, infra pp. 1175-76. Such a reading would also appear to disregard the deference due an agency in the interpretation of its own organic statute by pouring content into the term "hearing" that is neither immediately apparent, see Heckler v. Campbell, nor advanced by the agency itself. See Chevron, 467 U.S. at 843, 104 S.Ct. at 2781-82. Further, by adding meaning to the term "hearing," such a reading might also violate the Supreme Court's admonition in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), against the judicial fashioning of administrative procedures that neither Congress nor the agency has sanctioned. Also, were we to construe UCS I so broadly, we would be obliged to invalidate not only the post-construction hearing opportunity, but also to question the combined license hearing procedures for they, too, allow the Commission to avoid matters settled at the pre-approval process.
 
 
 31
 Petitioners next turn to § 185 of the Act. This provision explains the findings the Commission must make before approving a reactor license. Petitioners contend that, whatever ambiguity exists in § 189(a) as to the Commission's post-construction obligations, § 185 is crystal clear, leaving no doubt as to the Commission's inability to rely on previous determinations to whittle down the issues to be heard and resolved after construction. According to § 185, however, the Commission need simply find that
 
 
 32
 the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this chapter and of the rules and regulations of the Commission.
 
 
 33
 42 U.S.C. § 2235.
 
 
 34
 In sum, the Act itself does require two post-construction findings--one regarding the plant's accordance with the Act and one regarding its agreement with NRC regulations. But again there is nothing in the language of the statute indicating how the Commission is to go about satisfying these obligations.[4]
 
 
 35
 Petitioners posit that because § 185 emphasizes that the Commission must demonstrate compliance with the Act itself--and not just NRC regulations--the Commission need conduct its hearings and make its findings anew after construction. The problem with this point: there is nothing in the statute to suggest that the Commission cannot rely on its prior decisions finding portions of the plant to be in compliance with the Act (e.g., its design after Subpart B proceedings, or its siting after Subpart A proceedings) when it makes its post-construction findings.
 
 
 36
 In fact, other sections of the Act suggest that the NRC is endowed with significant discretion in determining what information is necessary to support the various findings required in the licensing process. See, e.g., 42 U.S.C. § 2232(a) ("In connection with applications for licenses to operate ... utilization facilities [i.e. nuclear reactors], the applicant shall state such technical specifications ... and such other information as the Commission may ... deem necessary in order to enable it to find that the utilization ... will provide adequate protection to the health and safety of the public.").[5]
 
 
 37
 Significantly, the Supreme Court has found agency reliance on prior determinations to be perfectly acceptable, even when the statute before it plainly calls for individualized hearings and findings. See Heckler v. Campbell, 461 U.S. at 468-70, 103 S.Ct. at 1958-59 (though Social Security statute requires individualized hearings on whether individual claimant is entitled to disability benefits, agency may rely on a previously promulgated generic finding as to availability of jobs for people with specific disabilities); Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (statutory requirement for an environmental assessment does not preclude a scheme in which the NRC determines through rulemaking whether certain activities threaten the environment, and then limits individualized hearings to whether the facilities at issue involve those activities); United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 771-72, 100 L.Ed. 1081 (1956) (upholding a Federal Communications Commission ("FCC") rulemaking effectively eliminating many applicants from a station license competition, despite provision in the Federal Communications Act offering each applicant a "full hearing"); FPC v. Texaco, Inc., 377 U.S. 33, 41-44, 84 S.Ct. 1105, 1110-12, 12 L.Ed.2d 112 (1964) (mechanism providing for summary rejection of certain contracts between natural gas companies is consistent with Natural Gas Act's "hearing" requirement). So too here. Though § 185 calls for a post-construction finding of compliance with the Act, it does nothing to intimate that the Commission may not rely on its previous findings that specific aspects of a plant satisfy the Act's mandates.
 
 
 38
 Indeed, since the panel decision was handed down, the Supreme Court has reemphasized its endorsement of parallel practices in a pair of cases. In Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos., 498 U.S. 211, 111 S.Ct. 615, 112 L.Ed.2d 636 (1991), the Court considered a provision of the Natural Gas Act mandating individualized proceedings before a company may abandon a gas supply or its contractual service obligations.[6] In an 8-0 decision, the Court found the Federal Energy Regulatory Commission's reliance on a promulgated, pre-authorized abandonment procedure in lieu of individualized hearings and findings in every case perfectly acceptable:
 
 
 39
 Time and again, "[t]he Court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration." ... "[A] contrary holding would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding."
 
 
 40
 Mobil Oil, 111 S.Ct. at 626 (quoting Heckler v. Campbell, 461 U.S. at 467, 103 S.Ct. at 1957).
 
 
 41
 In American Hosp. Ass'n v. NLRB, 111 S.Ct. 1539 (1991), the Court faced a provision of the National Labor Relations Act ("NLRA") requiring the National Labor Relations Board ("NLRB") to make a separate determination of the appropriate bargaining unit "in each case."[7] Petitioner suggested that the term "in each case" prevented the NLRB from delineating industry-wide rules regarding the applicable bargaining unit. The Supreme Court disagreed, unanimously concluding that
 
 
 42
 [a]s a noted scholar on administrative law has observed: "[T]he mandate to decide 'in each case' does not prevent the Board from ... [using] classifications, rules, principles, and precedents. Sensible men could not refuse to use such instruments and a sensible Congress would not expect them to." ...
 
 
 43
 This reading of the "in each case" requirement comports with our past interpretations of similar provisions in other regulatory statutes. See United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 771-72, 100 L.Ed. 1081 (1956); FPC v. Texaco, Inc., 377 U.S. 33, 41-44, 84 S.Ct. 1105, 1110-12, 12 L.Ed.2d 112 (1964); Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983). These decisions confirm that, even if a statutory scheme requires individualized determinations, the decision-maker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.
 
 
 44
 American Hosp. Ass'n, 111 S.Ct. at 1543 (quoting K. DAVIS, ADMINISTRATIVE LAW TEXT 145 (3d ed. 1972)).
 
 
 45
 In sum, the Court has had occasion to face several substantive statutes, each of which apparently commands the relevant agency to hold individualized hearings and make fresh findings in every case, much as petitioners argue the statute before us requires the Commission to start its hearings and findings anew after construction. However, the Court has consistently held that reliance on prior determinations is perfectly harmonious with statutory schemes similar to the one now before us.
 
 
 46
 If reliance on prior determinations is acceptable in other statutory contexts requiring individualized hearings and findings, we must be particularly wary of suggestions that it is untenable on Chevron step I grounds under § 185. The AEA has been consistently read--as it was written--to give the Commission broad regulatory latitude. See Siegel v. Atomic Energy Comm'n, 400 F.2d 778, 783 (D.C.Cir.1968) (The Act "is virtually unique in the degree to which broad responsibility is reposed in the [Commission], free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives."). See also BPI v. Atomic Energy Comm'n, 502 F.2d 424, 428 n. 3 (D.C.Cir.1974); City of Statesville, et al. v. Atomic Energy Comm'n, 441 F.2d 962, 977 (D.C.Cir.1969). The Supreme Court, moreover, has forcefully instructed that this latitude is especially applicable when the NRC is structuring its "own rules of procedure and ... methods of inquiry." Vermont Yankee, 435 U.S. at 543, 98 S.Ct. at 1211.[8]
 
 
 47
 Finally, we note that, were the post-construction procedures invalid because of their dependence on prior determinations, the logic of petitioners' interpretation of § 185 might undercut not only the post-construction procedures, but also the combined license. It, too, is tailored to avoid the reconsideration of issues settled in prior hearings. Thus, like a broad reading of UCS I, this would carry us much further than we went in the panel decision. See NIRS, 918 F.2d at 192-93, 196 n. 14.
 
 
 48
 Unable to conclude that the Act unambiguously prevents the NRC from adopting Part 52's post-construction procedures, we must move to the second step of the Chevron analysis.
 
 
 49
 Chevron Step II. Petitioners and amicus curiae raise the possibility that, during the lengthy construction process, new information might arise casting doubt on the continuing validity of the Commission's early findings regarding the propriety of a plant's design or siting. They argue that such new information must be considered under § 185 when the Commission makes its final post-construction determination that a plant has been constructed and will operate in conformity with the Act. Part 52 fails on this count, they submit, because it provides no vehicle for the consideration of these new developments, but rigidly relies on past findings, requiring the Commission to find only that, since all previous licensing requirements were met, a plant is "accordingly" in compliance with the Act.
 
 
 50
 Specifically, petitioners and amicus suggest that perhaps an earthquake, tornado or flood could occur after pre-approval but before operation, raising previously unexplored questions as to the siting of the plant--questions that would go unconsidered under the Commission's scheme. See Brief of Amicus Curiae, Committee to Bridge the Gap at 9. Likewise, an accident at a similarly configured plant could transpire, creating concerns as to the continuing viability of a plant's design. See Brief of Petitioners at 44. See also NIRS, 918 F.2d at 195. The panel, also concerned with such scenarios, concluded that the new information potential rendered any reliance on pre-construction findings untenable, and found this a reasoned basis for requiring the NRC to rehear all material issues regarding compliance with the Act after construction. See id. at 194-97.
 
 
 51
 This argument is not, we think, based on the plain intent of Congress, but rather falls within the ambit of Chevron step II. As we have discussed above, § 185 on its face does nothing to suggest that the NRC's reliance on prior determinations is invalid. Still, one might argue that reliance on pre-construction findings could be unreasonable, as Chevron uses that term, if the bases for these findings are drastically undermined by subsequent events.
 
 
 52
 In any event, the Commission has not ignored the problem of new information as petitioners suggest. Under §§ 52.103(b)(1)(ii)297 U.S.App.D.C. 178>>103(b)(1)(ii) and (2)(ii), any interested party may file a petition with the Commission to modify the terms of a combined license--and, thus, the acceptance criteria--even after construction is complete. The Commission is required under these provisions to determine whether "immediate action is required," including the need to conduct additional hearings. See § 52.103(b)(2)(ii). More simply, through this vehicle anyone may raise the possibility that, given new information, the Commission's continuing reliance on settled generic findings is based on an impermissible or arbitrary reading of the Act or NRC rules.
 
 
 53
 Petitioners argue that the petition process may not be amenable to judicial review. Section 52.103(b)(2) itself incorporates the procedures of 10 C.F.R. § 2.206, which provides in part that "[a]ny person" may "file a request to institute a proceeding ... to modify, suspend, or revoke a license, or for such other action as may be proper"; should relief be denied, § 2.206 also requires the Commission to provide a written statement explaining its reasons. Petitioners point out, and the panel observed, that "courts have treated § 2.206 petitions as enforcement actions presumptively unreviewable under Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)." NIRS, 918 F.2d at 196. Indeed, as the panel also mentioned, courts have held § 2.206 petitions unreviewable in actions for license revocation based on the inadequacy of quality assurance programs, Safe Energy Coalition v. NRC, 866 F.2d 1473 (D.C.Cir.1989), and emergency preparedness plans. Massachusetts v. NRC, 878 F.2d 1516 (1st Cir.1989).
 
 
 54
 After additional consideration, however, we think that Commission action on § 2.206 petitions authorized by Part 52 is reviewable. True, the Commission also uses § 2.206 as a vehicle for entertaining requests for enforcement actions where, of course, the petitions do fall within the unreviewability presumption of Heckler v. Chaney. Nonetheless, the choice to use the § 2.206 form cannot determine the reviewability question. Rather, we must look to the purpose to which the petition is put. Part 52 employs § 2.206 not as a means for requesting enforcement, but as an integral part of the licensing process itself. No court to date has ever found licensing decisions to be unreviewable, even when they involve § 2.206 petitions.
 
 
 55
 By way of comparison, we recall the specifics of Massachusetts v. NRC, a case in which the Commission's denial of a § 2.206 petition itself formed the basis of its decision to allow a facility to resume operations after a long shutdown. While noting that denials of § 2.206 petitions are ordinarily affected by the Heckler v. Chaney presumption, the First Circuit postulated that, because the reasoning set forth in the denial was the basis of the restart decisions, the substance of the denial was reviewable under 5 U.S.C. § 706(2)(A). Massachusetts v. NRC, 878 F.2d at 1522. This decision reinforces the point that the use to which a § 2.206 petition is put--not its form--governs its reviewability.
 
 
 56
 Thus, even if potential new factual information might undermine the reasonableness of the Commission's reliance on its prior determinations, and even if the Commission reads §§ 52.103(b)(1)(ii) and (2)(ii) to deny arbitrarily a meritorious petition raising such information, a court may properly intervene to adjudicate the question.
 
 
 57
 We pause here to note that when relying on prior determinations, many agencies provide mechanisms similar to § 2.206; their aim, like the Commission's here, is to allow interested parties to prevent agency reliance on previous determinations when new information or other pertinent concerns demand special consideration. Indeed, the Supreme Court has consistently commented favorably upon these petition processes and found them perfectly adequate to protect against unforeseen contingencies such as those petitioners presuppose.
 
 
 58
 While approving an FCC rule aimed at resolving many issues regarding station license awards--despite the Commission's statutory obligation to conduct a "full hearing" in each case--the Supreme Court in Storer Broadcasting commented that the rule " 'did not bind [the Commission] inflexibly to the licensing policies expressed in the Regulations.' " Storer Broadcasting, 351 U.S. at 205, 76 S.Ct. at 771 (quoting National Broadcasting Co. v. United States, 319 U.S. 190, 225, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1942)). In fact, recognizing that " 'time and changing circumstances,' " could "reveal that the 'public interest' is not served by application of the Regulations," the Court pointed out that the FCC had included a petition process in its "hearing" scheme so that interested parties might ask the Commission to waive its usual reliance on prior rulemaking determinations in particular cases. Id. The FCC petition rule, similar to the § 2.206 process now before us, provided:
 
 
 59
 Petition for amendment or waiver of rules. Any interested person may petition for issuance, amendment, repeal or waiver of any rule or regulation [used in lieu of a hearing on the matter]. Such petition shall show the text of the proposed rule, or its change, and set forth the reason in support of the petition.
 
 
 60
 47 C.F.R. § 1.702 (quoted in Storer Broadcasting, 351 U.S. at 202 n. 10, 76 S.Ct. at 770 n. 10).
 
 
 61
 Indeed, the Court in Storer Broadcasting concluded that, while mandating a "full hearing," the Act before it required no more than a general rule plus a petition process--and did so stating that, "[w]e do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing. If any applicant is aggrieved by a refusal, the way for review is open." Storer Broadcasting, 351 U.S. at 205, 76 S.Ct. at 770 n. 10.
 
 
 62
 Similarly, in upholding a Federal Power Commission ("FPC") rule designed to abbreviate the hearing process under the Natural Gas Act, the Court in FPC v. Texaco commented that "[i]n the present case, as in Storer, there is a procedure provided in the regulations whereby an applicant can ask for a waiver of the rule complained of. Facts might conceivably be alleged sufficient on their face to provide a basis for waiver," but the petition procedures provided by the FPC were deemed perfectly sufficient to handle such a contingency. FPC v. Texaco, 377 U.S. at 40-41, 84 S.Ct. at 1109-10. The FPC petition regulation itself provided that
 
 
 63
 [a] petition for the issuance, amendment, waiver, or repeal of a rule by the Commission shall set forth clearly and concisely petitioner's interest in the subject matter, the specific rule, amendment, waiver, or repeal requested, and cite by appropriate reference the statutory provision or other authority therefor.
 
 
 64
 18 C.F.R. § 1.7(b) (quoted in FPC v. Texaco, 377 U.S. at 40 n. 11, 84 S.Ct. at 1110 n. 11).
 
 
 65
 In Heckler v. Campbell, the Court, relying on FPC v. Texaco and Storer Broadcasting in upholding the Social Security practice of making individual eligibility decisions based on general guidelines, noted that "the regulations afford claimants ample opportunity both to present evidence relating to their own abilities and to offer evidence that the guidelines do not apply to them." 461 U.S. at 467, 103 S.Ct. at 1957. Finally, in American Hosp. Ass'n, the Court, in approving the industry-wide NLRB rule regarding bargaining units, pointed out that the rule itself creates an exception for "extraordinary circumstances." 111 S.Ct. at 1541.
 
 
 66
 By way of summary, the NRC's petition process is analogous in both form and substance to those used by other agencies to ensure that their reliance on settled rules is not so insensitive to new developments that they risk creating unreasonable interpretations of statutory mandates to conduct hearings and make findings. If, in a particular circumstance, the Commission's reliance on generic rules and prior findings proves to be an unreasonable or irrational interpretation of its statutory mandate or regulatory requirements, this court can exercise review.
 
 
 67
 To insist--as petitioners would have us do--that the Commission provide additional procedural safeguards for the consideration of new information would take us further than the Supreme Court has gone in these related cases. It would also raise severe Chevron problems. Petitioners would have us reject an agency's interpretation of its own organic statute as unreasonable because of our differing--and hardly expert--opinion as to the likelihood and potential severity of new information. In so doing, we would not only have to reject the NRC's petition process, but require it to address every material issue involved in the design, siting, and construction of a nuclear power plant after construction is completed--all based on our view of the potential of new information arising. To do so would take this Court across the line between our legitimate role in assuring reasonable statutory interpretations and into the illegitimate task of engrafting additional procedural requirements onto the Commission's regulatory process that Congress has not. See Vermont Yankee, 435 U.S. at 524, 98 S.Ct. at 1202 ("this Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments").
 
 
 68
 In closing, we add that the Commission has attempted to argue before us that § 2.206 is not merely a mechanism to reopen closed hearings and require new findings, but is also itself a hearing, albeit an informal one. Brief of Respondent at 29. The Commission has further suggested that informal hearings are acceptable under the Act, viz. § 189(a) does not prescribe formal hearing opportunities in the reactor licensing context.
 
 
 69
 Whether or not we accept that formulation, we hold that the post-construction procedures as they stand satisfy the Act. Whether or not we call § 2.206 a "hearing," that procedure does offer a useful and prudent addition to the Commission's licensing scheme by allowing interested parties to request the reopening of existing formal hearings. We do not follow this question any further, however, as the Commission's arguments on this score were not raised before the panel, nor advanced during the rulemaking process.
 
 
 70
 In sum, on a step II analysis, we conclude that the Commission's post-construction reliance on prior hearings and findings is indeed grounded in a permissible understanding of the statute. Any potential new information that might arise during construction raising questions as to its reliance on previous determinations can be given adequate attention through the petition process. To require more of the Commission than this would be to ignore the Supreme Court rulings in analogous situations, the deference owed the NRC, and Vermont Yankee 's admonitions.
 
 III.
 
 71
 We adopt the panel's conclusion that Subparts A and B, as well as the combined license procedures outlined in Subpart C, are acceptable under the Act. With regard to the post-construction hearing and finding regulations, we now hold that they also are based on permissible readings of the Act. The petition for review is therefore denied, and the validity of the Commission's Part 52 regulations upheld.
 
 
 72
 It is so ordered.
 
 
 73
 WALD, Circuit Judge, dissenting on the denial of a pre-operational hearing on new safety information, with whom MIKVA, Chief Judge and HARRY T. EDWARDS, Circuit Judge, join:
 
 
 74
 For all practical purposes this case is moot. The House of Representatives and the Senate have already approved legislation that would accomplish the "streamlined" nuclear licensing scheme that the Administration and the NRC have argued for in this appeal.[1] The President will likely sign the new amendments in the Fall and they will replace the sections of the old Atomic Energy Act construed in this case. And that, of course, is precisely the way the process should work. So radical a change in licensing policy as the majority opinion upholds today should come in a democratic society from the Congress, not from a frustrated agency which for nearly a decade has tried unsuccessfully to get the statute changed, and finally, struck out on its own. In light of those realities, I dissent only to express bewilderment at the tortured construction of a 38-year-old statute the majority has accepted in order to sustain an administrative turnabout that is no longer necessary to achieve the result its proponents seek.[2]
 
 I.
 
 75
 That said, let me turn to my problems with the majority's and the NRC's new construction of the Act, denying any hearing at all to even those affected petitioners who can show that changed circumstances, apart from nonconformity with the permit, which have arisen since the original construction permit was issued, now render the plant operationally unsafe. For that in a nutshell is what the NRC has done in its Part 52 regulations.
 
 
 76
 First, let me reiterate what the statute actually says. In this respect, I believe that the original panel (Wald, Sentelle & Thomas, JJ.) had it right. Section 185 provides:
 
 
 77
 All applicants for licenses to construct ... facilities shall ... be initially granted a construction permit.... Upon the completion of the construction ..., upon the filing of any additional information needed to bring the original application up to date, and upon finding that the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this chapter and of the rules and regulations of the Commission, and in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of this chapter, the Commission shall thereupon issue a license to the applicant.
 
 
 78
 42 U.S.C. § 2235. It says quite unmistakably that "[u]pon completion of the construction," and before an operating license is granted, the Commission must make two basic findings: (1) that the facility has been constructed and will operate in accordance with the application approved at the pre-construction stage, and (2) that the facility will operate in conformity with the Act, in particular § 103 of the Act, which directs that "no license may be issued ... if ... the issuance of the license ... would be inimical to the common defense and security or to the health and safety of the public." 42 U.S.C. § 2133(d). Indeed, I read the majority opinion to acknowledge that the second finding about operating in conformity with the Act's § 103 safety mandate is still required. Maj. op. at 1172, 1175. The difference now, of course, is that under the challenged NRC regulations, that finding of conformity with the Act can be made solely on the basis of the first finding that the plant has been built in conformity with the original license. Maj. op. at 1172 ("At the end of this hearing [on conformity to the acceptance criteria], the Commission must, under § 52.103(c), find that 'the acceptance criteria have been met and ... accordingly, the facility has been constructed and will operate in conformity with the Atomic Energy Act.' ") (emphasis deleted).
 
 
 79
 The original panel rejected the NRC's attempt to base the required finding of conformity with the Act solely on conformity with the construction permit largely because of § 189(a) of the Act. We found that section to be just as clear in its mandate that there be a hearing on request about conformity with the statute as § 185 is about the necessity for the finding of conformity itself. Section 189(a) says that after construction, but before the plant has been approved for operation, the Commission "shall grant a hearing ... upon ... request...." 42 U.S.C. § 2239(a)(1). We reasoned, again correctly I believe, that the requirement for a hearing prior to issuance of an operating license must logically encompass matters relevant to the findings that the Commission must make at the post-construction phase under § 185. That is, the hearing must accommodate material and credible challenges to the NRC's proposed findings:
 
 
 80
 (1) "that the facility ... has been constructed and will operate in conformity with the application," and
 
 
 81
 (2) "that the facility ... has been constructed and will operate in conformity with the provisions of [the Act] and of the rules and regulations of the Commission."
 
 
 82
 42 U.S.C. § 2235.
 
 
 83
 The original panel was not able to reconcile the statutory directives of §§ 185 and 189(a) with the Commission's designation of a post-construction hearing as confined to issues of conformity with the construction permit alone and its regulation of any other issues dealing with safety to a sidebar proceeding in which the parties must file a petition under § 2.206, a mechanism traditionally preserved for license amendments, and under which the Commission has total discretion to "consider the petition and determine whether any immediate action is required." 10 C.F.R. § 103(b)(2)(ii) (1989). We reasoned that "although many issues of a plant's eventual conformity with the Act could be heard at the [earlier] combined-license hearing, some issues cannot--by definition--be heard at that time," 918 F.2d at 195, citing as examples "significant new experiences with the plant design or operation, significant new information about site seismology or meteorology, or significant changes in local population density or infrastructure." Id. We concluded:
 
 
 84
 Congress, through §§ 185 and 189(a), required the Commission to make pre-operation findings that the plant would operate in conformity with the Act and to provide a hearing upon request to address material issues related to that finding. Although the Commission retains broad authority to define standards and thresholds for determining when new information raises a material issue of a plant's conformity with the Act, if such information is presented, it must provide a hearing upon request. This is the express mandate of §§ 185 and 189(a).
 
 
 85
 Id.
 
 
 86
 That analysis remains sound, in my view. In Chevron jurisprudence, this qualifies as a "Chevron I " case, where Congress has spoken to the precise issue. See Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). The NRC apparently thought so as well until quite recently, since it continually sought congressional authorization to change the hearing requirement.[3] Today, however, the majority, along with the Commission, changes course and accepts a new construction that the hearing required by § 189(a) need only encompass nonconformity with the acceptance criteria of the original pre-construction permit. I find such an interpretation totally at odds with a natural reading of the Act; nothing in the text (or legislative history) of § 189(a) remotely suggests that the hearing required before issuance of a license can be confined by the agency to only one of the two findings it must make under § 185.
 
 
 87
 The majority and the NRC, however, argue that the post-construction hearing can be so confined because logically a finding that the construction is in conformity with the criteria set down in the pre-construction permit assures that the operation will be safe; this is because at the first pre-construction hearing or, in the case of this new combined license, at even earlier stages when generic designs are approved and sites selected, all safety issues are adequately disposed of. In the majority's view, the only "question" in the case is "whether the Commission must rehear issues already resolved at earlier stages in the licensing process." Maj. op. at 1173. And so the mere requirement of a "hearing" in § 189(a) "gives this Court no plain textual authority to reject the Part 52 hearing scheme." Id.
 
 
 88
 Thus, the majority frames its own question in order to produce its own answer. In this respect, I believe it consistently misstates the petitioners' and the panel's position as one requiring a new hearing on request for any and all material safety issues, whether or not those issues were raised and resolved at the earlier hearing or at a prior rulemaking, and whether or not any material new information on these issues has surfaced since the first hearing. See Maj. op. at 1173 ("the post-construction hearing opportunity must ... allow a full opportunity to revisit material design, siting, and other issues") (emphasis supplied), 1179 (the Commission must "address every material issue involved in the design, siting, and construction ... after construction is completed"), 1177 (characterizing panel's decision as "requiring the NRC to rehear all material issues regarding compliance with the Act after construction"). This has never been petitioners' stance, nor was it any part of the earlier panel's decision. Repeatedly at oral argument, petitioners' counsel stressed that "if an issue could have been raised in a previous proceeding, then the Commission has every right in the world ... to say no, we are not going to have a hearing." Transcript of Oral Argument (Nov. 20, 1991) ("Tr.") at 35; see also colloquy at 16-17 (Question: "I hear you to be saying that only if there is some fresh new information ... would you be in line for a hearing.... [Y]ou would have to meet, clearly, a threshold of material information which was relevant to a material safety defect. Is that correct?" Answer: "That is absolutely right.") (emphasis supplied). The panel opinion also emphasized that the "Commission retains broad authority to define standards and thresholds for determining when new information raises a material issue of a plant's conformity with the Act." 918 F.2d at 195 (emphasis supplied). The majority has thus constructed its own strawman in order to light the bonfire underneath him. But the majority's version is not and never has been the real issue in this case, and indeed the Commission's own proposed regulation recognized as much: it originally provided for a post-construction hearing "on the basis ... that significant new information shows that some modification to the site or the design is necessary to assure adequate protection of public health and safety or the common defense or security." 43 Fed.Reg. at 32,077 (1988).
 
 
 89
 In the final analysis, then, the majority and the NRC ask us to accept without more their assumption that in the present state of the art as to nuclear design and plant siting, a finding that a design and a site are safe and secure at one point in time is invulnerable to later challenge on the basis of any new information, be it Chernobyl, Three Mile Island-type accidents, earthquakes, floods or changes in the cooperative stance of local communities who must implement evacuation plans in case of nuclear accidents. I do not see how any newspaper reader in today's world can swallow that elephantine assumption. If such a counterintuitive assumption is to form the basis for the giant step taken in this nuclear licensing "reform," it should, as we concluded in the panel opinion, be at the behest of the Congress, which is politically accountable for its decisions. That Congress appears in fact to be in the last stages of doing just that argues even more forcefully for the court's holding back under the original 1954 Act.
 
 
 90
 Ironically, the NRC regulation itself does not presume that the state of the art in nuclear plant design has "plateaued." Although the NRC's brief suggested that "Part 52 rests on the premise that, given the current state of nuclear technology, the Commission can make definite safety judgments and establish, before construction, acceptance criteria that (if met) assure the public health and safety," En Banc Brief for Respondents at 18 (emphasis deleted), the regulation itself refers to the generic designs as "evolutionary" and "advanced." 54 Fed.Reg. 15,374 (1989). As such they carry within them the seeds of the following paradox raised during the congressional hearings:
 
 
 91
 In December 1991, an engineering company requests a "standard design certification for an essentially complete nuclear plant design" which has never previously been tried and which no utility has expressed an intention or even an interest in using as the basis for a power plant at any particular site. The NRC "certifies" the design in a generic rulemaking proceeding;
 
 
 92
 In 2001, a utility decides to construct a nuclear plant near Reno, Nevada. In its application for a combined license, the utility "references" the design that was "certified" by the Commission in December 1991; this is the first time that any utility has proposed to construct a power plant at a specific site with this design;
 
 
 93
 Members of the public who are concerned about the construction of a nuclear plant in their community intervene in the licensing process and request a hearing on a number of issues, including the safety of the basic design of the proposed plant. They are told by the NRC, however, that it made a final decision on the design of the plant in a rulemaking proceeding over a decade ago. Obviously, none of the residents of the community participated in or had any reason to participate in the rulemaking proceeding which took place eleven years earlier and had no relationship to Nevada or any other specific location;
 
 
 94
 In 2002, therefore, the NRC issues a combined license without ever allowing the residents of Reno to have a hearing on the safety of the basic design of the plant--a design, it should be emphasized, that is "evolutionary" and has never previously been tested in any commercial nuclear reactor;
 
 
 95
 In 2006, five years into construction of the Reno plant, new scientific studies are published which raise serious, previously-unconsidered safety issues regarding the design of the plant. But when the residents of Reno request a hearing on these issues, prior to operation of the plant, they are told that they have no right to a hearing because they cannot demonstrate that the plant has not been built in accordance with the combined license;
 
 
 96
 Consequently, the plant goes into operation in the absence of input by members of the affected public on the safety of the plant's underlying design in light of the most recent scientific data available.
 
 
 97
 National Energy Security Act of 1991: Hearing Before the Senate Committee on Energy and Natural Resources, 102d Cong., 1st Sess. 123 (1991) (testimony of Eric R. Glitzenstein, on behalf of the Union of Concerned Scientists and Nuclear Information and Resource Service). I submit this "hypothetical" poses the real issue in this case and that the congressional supporters of §§ 185 and 189(a) clearly never approved or even envisioned such a scenario. When the rhetoric of the majority is stripped down to its core, it fails to overcome the straightforward thrust of the statute's text in §§ 185 and 189(a). Why, indeed, would the Congress have required that a finding of conformity with the safety requirements of the Act (as well as conformity with the construction license) be made in the post-construction phase if the Commission could rely for that finding solely on evidence presented at the first pre-construction hearing, even when new and significant safety-related evidence was proffered at the later stage? The majority's answer makes no sense at all. The only reasonable way to read the 1954 Act's provisions is as creating a necessary nexus between the required post-construction findings and the scope of the hearings required at that same stage. To do otherwise, as the NRC and the majority urge, is to elevate word wizardry to its highest form. Thus, I dissent from the unnatural reading given the straightforward requirement in the Act for a hearing on heretofore unexplored material safety issues prior to licensing operation of a nuclear plant.
 
 II.
 
 98
 My colleagues spend a good bit of time elaborating on the notion that "where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration." Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983) (citing FPC v. Texaco Inc., 377 U.S. 33, 41-44, 84 S.Ct. 1105, 1110-12, 12 L.Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 771-72, 100 L.Ed. 1081 (1956)). See Maj. op. at 1175-77.
 
 
 99
 The Heckler v. Campbell rule is unassailable as a matter of law and, indeed, common sense. It does not, however, have any bearing on the issue before us today. That an agency may fulfill a single hearing requirement by using the results of a prior rulemaking to structure the issues in that hearing says nothing about whether an agency may fulfill a statutory requirement for two hearings to be held at different times by holding only one hearing and substituting the results of the first hearing for the second hearing. The majority's insistence on using the Heckler v. Campbell principle as an excuse to abandon the § 189(a) post-construction hearing on statutory compliance completely undermines the statutory scheme enacted by Congress. Sections 185 and 189(a) on their face require "case-by-case consideration," Heckler, 461 U.S. at 467, 103 S.Ct. at 1957, in the post-construction hearing. Indeed, the whole point of the second hearing is to take that last crucial look at the combination of design, site, construction, and industry experience to see if the facility in fact satisfies the safety criteria of the Act. The Court in Power Reactor said as much way back in 1961:
 
 
 100
 Even a glance at § 185 suffices to show that issuance of a construction permit does not make automatic the later issuance of a license to operate. For that section sets forth three conditions, in addition to the completion of the construction, which must be met before an operating license is granted: (1) filing of any additional information necessary to bring the application up to date--information which will necessarily in this case include detailed safety data concerning the final design of petitioner's reactor; (2) a finding that the reactor will operate in accordance with the act and regulations--i.e., that the safety and health of the public will be adequately protected--and with the construction permit itself, which is expressly conditioned upon a full investigation and finding of safety before operation is permitted; and (3) the absence of any good cause why the granting of a license to operate would not be in accordance with the Act--e.g., a showing by respondent unions, who will have full rights to appear and contest the issuance of an operating license, that the reactor may not be reasonably safe.
 
 
 101
 Power Reactor Dev. Co. v. International Union of Elec., Radio and Machine Workers, 367 U.S. 396, 411, 81 S.Ct. 1529, 1536-37, 6 L.Ed.2d 924 (1961) (emphasis supplied).
 
 
 102
 Had Congress thought that conformity with the license necessarily equated with conformity with the Act, it would hardly have expressly mandated that second look and, if necessary, a second hearing. While the Heckler v. Campbell rule typically serves an important efficiency function of avoiding repetitive litigation, here it is being misused to abrogate a statutory right to meaningful participation in the licensing of nuclear facilities.
 
 
 103
 Furthermore, in absolutely barring a pre-operational hearing on a facility's conformity with the Act, the regulatory scheme sanctioned today goes considerably beyond those approved in Storer, Texaco, or Heckler. I do not now dispute, nor did the panel opinion earlier, that the Commission may as a general matter assume that a plant constructed according to an approved design will operate safely and in accordance with the Act. The critical inquiry in this case is what must happen under a statute requiring an individualized pre-operational hearing when new information that is acknowledgably material to the safety of the plant and which could not have been factored into the original generic determination is offered at the pre-operational stage. My reading of the regulatory schemes approved in Storer, Texaco, and Heckler is that in all of them when a party demonstrates that the generic premise is inapplicable to its particular case it is entitled to a full hearing on its claim.
 
 
 104
 Thus, my colleagues are correct to note that the Supreme Court has approved agency reliance on generic findings in tandem with a mechanism by which a party can present evidence that the prior determination should be set aside. Maj. op. at 1178-79. What they fail to mention, however, is that at least in Storer, Texaco, and Heckler, when a party has in fact presented such evidence, that party is entitled to a "full hearing" on its claim:
 
 
 105
 We read the Act and the Regulations as providing a "full hearing" for applicants who have reached the existing limit of stations, upon their presentation of applications ... that set out adequate reasons why the Rules should be waived or amended. The Act, considered as a whole, requires no more.
 
 
 106
 Storer, 351 U.S. at 205, 76 S.Ct. at 771-72. Similarly, the Court in Texaco, expressly relied on access to a hearing in approving the regulatory scheme at issue there:
 
 
 107
 In the present case, as in Storer, there is a procedure provided in the regulations whereby an applicant can ask for a waiver of the rule complained of. Facts might conceivably be alleged sufficient on their face to provide a basis for waiver of the price-clause rules and for a hearing on the matter.
 
 
 108
 377 U.S. at 40-41, 84 S.Ct. at 1109-10 (emphasis supplied). Finally, the Heckler Court also found significant the fact that a disability applicant had the right, at the hearing on her claim, to present evidence calling into question the applicability of the generic rule to her particular case:
 
 
 109
 Both FPC v. Texaco, Inc. and United States v. Storer Broadcasting Co. were careful to note that the statutory scheme at issue allowed an individual applicant to show that the rule promulgated should not be applied to him. The regulations here provide a claimant with equal or greater protection since they state that an administrative law judge will not apply the rules contained in the guidelines when they fail to describe a claimant's particular limitations.
 
 
 110
 461 U.S. at 467 n. 11, 103 S.Ct. at 1957 n. 11.
 
 
 111
 It seems a fortiori that if the Supreme Court found it crucial that an individual denied social security claims or a broadcaster a license on the basis of a generic rule be allowed the right to a hearing if he could pass a threshold test of why the generic rule should not apply to him, it would demand no less where the lives of millions of people for generations to come may be at stake. The regulatory schemes sanctioned in Storer, Texaco and Heckler, provided that where a party could demonstrate that circumstances warranted disregarding a prior, generic determination, the agency would set aside that determination and consider, at an individual hearing, that party's claim. That is all petitioners ask, and all the original panel decision provided.
 
 
 112
 None of the precedents discussed by the majority--individually or cumulatively--stand for what the majority needs to sustain its aberrant holding. A generic finding that a particular design or site is safe made before construction is begun--in some cases, decades before construction is begun--cannot satisfy a specific statutory requirement for a finding and a hearing after construction is completed that the plant will operate safely when new or material information has arisen in the meantime that materially reflects upon the design, site, surrounding environment or other nonconstruction factor affecting operational safety.
 
 III.
 
 113
 The final aspect of the majority opinion with which I take issue concerns the "safety valve" mechanism of Part 52, namely § § 52.103(b)(1)(ii) and (2)(ii), in which an interested party may petition the Commission at the pre-operational phase to modify the license and the Commission then determines whether "immediate action is required." This mechanism is the only answer the majority supplies to the acknowledged risk arising from critical new safety information that comes into being after a design, site, or combined license has been approved at the pre-construction stage. Maj. op. at 1177-78. No criteria for the Commission's determination under (b)(2) are set out, and even if the Commission determines immediate action is required, it need not (though it may) grant the petitioners a hearing.
 
 
 114
 One thing should be clear from the start. This procedure is not a hearing, nor has the majority treated it as such. Maj. op. at 1180. Originally the Commission would not even acknowledge that denial of such a petition was judicially reviewable; at the en banc rehearing it conceded reviewability, and the majority assumes it as well. Maj. op. at 1177-78. The standards for such review, however, are murky as extended colloquies at oral argument demonstrated all too well. Tr. at 45-51. And if a hearing is denied by the Commission there will, of course, be no record for us to review. Nonetheless, the majority finds this opportunity to petition for exercise of the Commission's discretion to reopen the design or site decision to be an adequate substitute for the statutory right to a hearing. I cannot. Several years ago, a panel of this court (Wilkey, Wald & Bork, JJ.) also disagreed: "the mere fact that a party can seek reopening is not a sufficient substitute for the hearing rights guaranteed by section 189(a)." San Luis Obispo Mothers for Peace v. NRC, 751 F.2d 1287, 1312 (D.C.Cir.1984) (emphasis in original), reh'g en banc, 789 F.2d 26, cert. denied, 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986); see also id. at 1316 ("we cannot conclude that the opportunity to seek reopening was an adequate substitute for the hearing guaranteed petitioners as a matter of right under section 189(a)") (emphasis in original). The direction of Congress was as clear to the San Luis Obispo court then as it is opaque to the en banc court now: Congress mandated the NRC to provide a hearing opportunity; a discretionary petition combined with a possibility for judicial review without a record or any "law to apply" is not an adequate substitute.
 
 CONCLUSION
 
 115
 Congress is on the verge of amending the Atomic Energy Act to permit the kind of expedited licensing the NRC sought to impose on its own in Part 52. That kind of radical departure from past licensing procedures requires congressional action; not even the most strained of rationales can successfully accommodate Part 52 with §§ 185 and 189(a) of the old Act which require post-construction findings and the opportunity for a hearing on the plant's conformity with both the construction license and the Atomic Energy Act. The majority's gargantuan effort in the end is not worth the candle; Chevron is turned on its head and precedents distorted to accomplish an end already gained in a more appropriate forum. I dissent.
 
 
 116
 BUCKLEY, Circuit Judge, concurring in part and dissenting in part:
 
 
 117
 I am in substantial agreement with the majority on all but its essential conclusion. As I find that neither the potential post-construction hearing on conformity with the license's acceptance criteria nor the section 2.206 proceeding is a permissible substitute for the pre-operational hearing mandated by section 189(a)(1) when read in conjunction with section 185, I must dissent.
 
 
 
 *
 Circuit Judge RUTH BADER GINSBURG was recused from this case
 
 
 [1]
 We cannot agree with the suggestion that this Court should withhold a fully completed judicial opinion because Congress and the President may soon settle on legislation that might render it moot. See Partial Dissent of Judge Wald at 1180 (hereinafter "Partial Dissent"). We are judges engaged in the task of deciding cases as they are put to us, not political prognosticators
 
 
 [2]
 The NRC's determinations as to what issues are material to its licensing decisions are, of course, subject to judicial review. See UCS II, 920 F.2d at 55
 
 
 [3]
 We do not, as the dissent suggests, misstate petitioners' position as requiring a hearing after construction for any and all issues. See Partial Dissent at 1182-83. We acknowledge petitioners' concession that the Commission need not rehear immaterial issues after construction. Petitioners do insist, however, that § 189(a) of the Act provides them the right to raise every material issue of fact at every hearing in the licensing process. It is this argument that we reject, recognizing instead the Commission's power to hear argument on each material issue only once, and to consider every issue heard as settled thereafter. Indeed, UCS II 's interpretation of § 189(a) and its explanation of UCS I on this score is, we think, clear
 
 
 [4]
 Despite claims to the contrary, see Partial Dissent at 1182, §§ 185 and 189(a) are not necessarily connected as a matter of logic. Section 185 requires post-construction findings of conformity in every case, whereas § 189(a) requires the Commission to grant a post-construction hearing only if an interested party requests one. The statute thus plainly envisions that the conformity findings might be made in the absence of a hearing
 
 
 [5]
 See also 42 U.S.C. § 2201:
 In the performance of its functions the Commission is authorized to--
 (i) prescribe such regulations or orders as it may deem necessary ... (3) to govern any activity authorized pursuant to this chapter, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property.
 
 
 [6]
 Section 7(b) of the Natural Gas Act provides in pertinent part:
 No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission ... without the permission and approval of the Commission first had and obtained after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.
 15 U.S.C. § 717f(b) (emphasis added).
 
 
 [7]
 Section 9(b) of the NLRA provides:
 The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof.
 29 U.S.C. § 159(b) (emphasis added).
 
 
 [8]
 The partial dissent appears to suggest that the wisdom of Part 50's step-by-step licensing regime was endorsed by the Supreme Court in Power Reactor Dev. Co. v. International Union of Elec., Radio and Machine Workers, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). See Partial Dissent at 1185. In fact, that decision merely held the Part 50 regime to be one acceptable interpretation of the Act, and did not suggest that another interpretation, such as the one now before us, would be improper. See NIRS, 918 F.2d at 193 (Wald, J.)
 
 
 [1]
 Clifford Krauss, Energy Bill Given Approval in House, N.Y. TIMES, May 28, 1992, at A1
 
 
 [2]
 As to the majority's suggestion that delaying judicial en banc resolution of a hotly contested legal issue which Congress is on the verge of deciding is somehow inconsistent with the judicial function, Majority opinion ("Maj. op.") at 1170 n. 1, see Escobar v. INS, No. 89-5037, Order (D.C.Cir. Oct. 16, 1990) (granting motion to delay en banc briefing where both Houses of Congress had passed mooting legislation, but before House-Senate conference, final vote in either chamber, or presentation to the President); id. (D.C.Cir. Nov. 8, 1990) (subsequent order granting motion to suspend briefing where conference report had been passed by Congress but not yet presented for President's signature)
 
 
 [3]
 See, e.g., Nuclear Licensing Reform: Hearing Before the House Subcommittee on Energy and Commerce, 100th Cong., 2d Sess. (1988); Nuclear Facility Standardization Act of 1986: Hearing Before the Senate Committee on Energy and Natural Resources, 99th Cong., 2d Sess. (1986); Nuclear Regulatory Reform: Hearings Before the Senate Subcommittee on Nuclear Regulation of the Committee on Environment and Public Works, 99th Cong., 1st Sess. (1985); NRC Licensing Reform: Hearing Before the House Subcommittee on Energy Conservation and Power of the Committee on Energy and Commerce, 98th Cong., 1st Sess. (1983); Nuclear Regulatory Commission Operating License Process: Oversight Hearing Before the House Subcommittee on Energy and the Environment of the Committee on Interior and Insular Affairs, 97th Cong., 1st Sess. (1981)