42 F.3d 1501
 Nuclear Reg. Rep. P 20,568, 25 Envtl. L. Rep. 20,499,
1995 Fed.App. 13P
 Frank J. KELLEY, Attorney General of the State of Michigan;
Herbert P. Read; Norman W. Perman; Susan
Kimmelman; the Lake Michigan
Federation; and Don't Waste
Michigan,
Petitioners-
Appellants,
v.
Ivan SELIN; James R. Curtiss; E. Gail De Planque; Forrest
J. Remick; Kenneth C. Rogers; United States
Nuclear Regulatory Commission; and
United States of America,
Respondents-Appellees,
Consumers Power Company, Intervenor-Respondent.
 Nos. 93-1646, 93-1710, 93-3613 and 93-3749.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 11, 1994.
Decided Jan. 11, 1995.
 
 Robert L. Graham (briefed), Jenner & Block, Chicago, IL, Frank J. Kelley (argued), Office of Atty. Gen., Appellate Div., John C. Scherbarth, Asst. Atty. Gen. (briefed), Natural Resources Div., Lansing, MI, for Frank J. Kelley.
 Joel T. Pelz, Robert L. Graham, Jenner & Block, Chicago, IL, for Herbert P. Read, Norman W. Perman, Susan Kimmelman, Lake Michigan Federation.
 J. Carol Williams, Albert M. Ferlo, Jr. (briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, for Ivan Selin, James R. Curtiss, E. Gail De Planque, Forrest J. Remick, Kenneth Rogers.
 Peter G. Crane (argued & briefed), U.S. Nuclear Regulatory Com'n, Washington, DC, for U.S. Nuclear Regulatory Com'n.
 Michael A. Bauser (briefed), Newman & Holtzinger, Washington, DC, for all amici curiae.
 Michael A. Carvin (argued), Shaw, Pittman, Potts & Trowbridge, Washington, DC, for Consumers Power Co.
 Robert L. Graham (briefed), Jenner & Block, Chicago, IL, Frank J. Kelley (argued), Office of Atty. Gen., Appellate Div., Kelly G. Keenan, Asst. Atty. Gen., Michigan Dept. of Atty. Gen., Environmental Protection Div., John C. Scherbarth, Asst. Atty. Gen. (briefed), Natural Resources Div., Lansing, MI, for Frank J. Kelley in No. 93-3749.
 Eric Glitzenstein (briefed), Meyer & Glitzenstein, Washington, DC, for Don't Waste Michigan.
 J. Carol Williams, Albert M. Ferlo, Jr. (briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Janet Reno, U.S. Atty. Gen., Washington, DC, for U.S.
 Before: MILBURN, BOGGS, and NORRIS, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 This appeal involves four separate actions, consolidated for appeal. The actions docketed as Nos. 93-3613 and 93-3749 seek review of a Nuclear Regulatory Commission ("NRC") order approving use of a VSC-24 concrete cask for storage of spent nuclear fuels. The action docketed as No. 93-1646 is before this court from a transfer directed by the district court after it found that this court has proper subject matter jurisdiction. The remaining action, No. 93-1710, appeals the district court's holding that it lacked subject matter jurisdiction to review the NRC order and grant relief for the alleged violations of the National Environmental Policy Act, 42 U.S.C. Sec. 4321.
 
 
 2
 On appeal, the issues are (1) whether petitioners have standing to challenge the NRC's final rule permitting storage of spent nuclear fuels in the VSC-24 cask; (2) whether the NRC's addition of the VSC-24 storage cask to the list of approved systems at 10 C.F.R. Sec. 72 (Subpart K), constituted a generic rulemaking or whether the NRC was required to conduct an "on-the-record" adjudicatory hearing pursuant to Sec. 189(a) of the Atomic Energy Act ("AEA"), 42 U.S.C. Sec. 2239, and the Administrative Procedure Act, 5 U.S.C. Sec. 553; (3) whether respondents made significant site-specific decisions regarding Palisades without granting a hearing on these decisions; and (4) whether the NRC complied with the National Environmental Policy Act ("NEPA"), 42 U.S.C. Sec. 4321 et seq., or whether it acted arbitrarily, capriciously or in abuse of its discretion in promulgating the final rule permitting use of the VSC-24 cask in reliance upon earlier environmental analyses assessing the impact of the rule change on nuclear reactor sites. For the reasons that follow, we affirm.
 
 I.
 A.
 
 3
 In 1982, Congress passed the Nuclear Waste Policy Act, which mandated that the Department of Energy ("DOE") construct a federal repository for the permanent storage of spent nuclear fuels. Nuclear Waste Policy Act of 1982, as amended in 1987, 42 U.S.C. Secs. 10101, et seq. Under the Act, the DOE was required to take title to spent fuels as early as 1998. Congress indicated, however, that producers of such waste are responsible for its storage, preferably at reactor sites, until the repository is completed. 42 U.S.C. Sec. 10151(a)(1). Completion is now expected no earlier than 2015.
 
 
 4
 At the same time, Congress directed the Secretary of Energy to establish a demonstration program for dry storage of spent fuels at existing nuclear plants. 42 U.S.C. Sec. 10198(a) ("Sec. 218(a)"). The program was intended to establish technologies that the NRC "may by rule, approve for use at the sites of civilian nuclear power reactors without, to the maximum extent practicable, the need for specific additional site-specific approvals by the Commission." 42 U.S.C. Sec. 10198(a). Thus, the demonstration program was expressly intended to provide the Commission a basis to approve various dry storage technologies for use at civilian reactors without site-specific hearings. In the Act, Congress provided that the agency was to establish procedures for the licensing of any technology approved under Sec. 218(a). 42 U.S.C. Sec. 10153. One of the technologies explicitly mentioned in Sec. 218 was storage casks for spent nuclear fuel. The impetus behind Congress' action was the belief that existing on-site storage facilities at most reactors, which consist of pools for underwater storage, would be insufficient to meet storage needs prior to the opening of the federal repository. Moreover, the risk of transporting radioactive wastes to off-site facilities also raised some concerns. By 1987, the DOE had entered into three cooperative agreements with utilities to demonstrate a form of dry cask storage.
 
 
 5
 In 1990, the NRC promulgated 10 C.F.R. Sec. 72 (Subpart K), which grants a general license to store nuclear fuel in approved casks at reactor sites, provided certain conditions are met. Thus, the NRC succeeded in eliminating the need for site-specific approvals. Under the new rule, utilities desiring to increase their on-site storage capability have the option of storing spent nuclear fuels in a cask approved by the NRC pursuant to the general license or applying for a site-specific license. The new rule listed four types of approved storage casks.
 
 
 6
 The NRC's 1990 rulemaking was accompanied by an Environmental Assessment ("EA") that concluded that the new technology would have no significant impact on the human environment. This finding was based in part on the fact that each site at which the casks would be used had already been the subject of an environmental impact statement in connection with the licensing of the plant. 55 Fed.Reg. 29,190. Because the EA found that the proposed rule would not produce any significant effect on the environment, preparation of an environmental impact statement was not required.
 
 
 7
 Subpart L of the rule sets forth the procedure for adding new storage systems to the list of approved designs. Manufacturers seeking approval must submit to the agency a safety analysis report showing that the design is suitable for storage for at least 20 years. The manufacturer must conduct, or permit the NRC to conduct, whatever tests are deemed necessary and must conduct design, testing, fabrication and maintenance of the casks under a quality assurance program suitable to the NRC.
 
 
 8
 Palisades is a nuclear power reactor located on the eastern shore of Lake Michigan in Van Buren County, Michigan. It was licensed by the Atomic Energy Commission in September 1972. The reactor is owned and operated by Consumers Power Company ("Consumers"). As a by-product of its operations, Palisades creates spent fuel, which remains dangerous long after it is removed from the reactor. Until 1989, Consumers utilized a fuel pool facility for storage of its wastes at the Palisades plant. Such storage is permitted under the Palisades license. Around 1989, with its fuel pool filling to capacity, Consumers opted to try dry storage of spent fuel in the VSC-24 dry cask manufactured by Pacific Sierra. The ventilated storage cask is comprised of a concrete cask and a steel, seal-welded basket. The spent fuel is placed in the basket, and the basket is drained, decontaminated, filled with helium and welded shut. It is then loaded in the concrete cask, which is equipped with a metal liner. When fully loaded, each cask weighs 130 tons. After the cask is loaded, the entire container is transported to a concrete pad. At Palisades, the pad is located behind and above the nuclear generating facility and within approximately 150 yards of the shore of Lake Michigan. The nuclear generating facility, however, is located between Lake Michigan and the pad. Plaintiffs state that the site chosen is characterized by geologists as a high-risk erosion area. Although Consumers' selection of the VSC-24 cask was in compliance with Michigan law,[1] its design had not, at that time, been tested at a nuclear reactor. The cask was selected, however, because it was expected to be a cheaper and more spacious method of storage than other systems.
 
 
 9
 On March 12, 1990, Palisades applied to the NRC for licensing authority to construct and maintain a dry spent fuel storage installation at its plant, using the VSC-24 casks. At the time of the application, the NRC had not issued the general license under 10 C.F.R. Sec. 72 (Subpart K), and site-specific licensing was the only method of approval possible for civilian reactors. However, in July 1990, the NRC approved the general license, and Consumers withdrew its application for the specific license.
 
 
 10
 The NRC's initial response to Palisades was to advise it that the application did not comply with the NEPA, 42 U.S.C. Sec. 4321, or NRC regulations. The NRC noted that the license application was deficient in failing to include a complete environmental report addressing site-specific issues at Palisades. On May 31, 1990, Palisades filed an amended environmental report. Thereafter, on July 13, 1990, the NRC published a notice in the Federal Register stating that Consumers had filed the environmental report and that the NRC intended to review the report to determine whether an environmental impact statement was warranted. In addition, the NRC invited members of the public whose interests would be affected by the grant of a license to apply for a hearing. The NRC received applications for a hearing, but before the agency took any action, Palisades gave notice that it was withdrawing its application.
 
 
 11
 On August 17, 1990, the NRC amendment to 10 C.F.R. Sec. 72 (Subpart K) granting a general license to approved storage technologies became final. In response to requests for a hearing, the NRC asserted that although the right to a hearing did exist as to the grant of a specific license, no such right existed in the case of a general license granted through an administrative, "generic rulemaking." 55 Fed.Reg. 29,182. The NRC did admit, however, that the peculiarities of a particular site might create the need for "site specific licensing action" involving a hearing. 55 Fed.Reg. 29,182. At the time the amendment became effective, the VSC-24 was not on the list of approved storage casks.
 
 
 12
 In early 1991, Consumers applied to the Michigan Department of Natural Resources for permission to construct a concrete pad on which storage casks could be located. Although Subpart L specifically explains that the final step in the approval process is the issuance of a certificate of compliance to the manufacturer of a cask after the NRC concludes that certain safety standards are met, the manufacturer of the VSC-24 cask, Pacific Sierra, asked the NRC for an exemption to its regulations to allow construction of the VSC-24 casks for Palisades in April 1991, before a certificate of compliance was issued. Even though construction of a cask is not to begin until such a certificate has been issued, the NRC granted the exemption, allowing the manufacturer to begin building three metal baskets and eight concrete casks. Petitioners did not intervene at the time of the request for an exemption, the notice for which was published by the NRC. 56 Fed.Reg. 41,870 (1991).
 
 
 13
 On April 4, 1991, Pacific Sierra formally applied for a certificate of compliance for the VSC-24 cask, which certificate would have the practical effect of adding the cask to the list of approved storage bins. 10 C.F.R. Sec. 72.214. A preliminary certificate was issued in April 1992. In June 1992, construction was completed on the VSC-24 casks to be used at Palisades. On June 26, 1992, the NRC published a notice to the public of its intent to amend the list of approved casks to include the VSC-24 cask and provided a 75-day period of public comment. 57 Fed.Reg. 28,645 (1992). The initial period of comment was followed by an additional 30-day period after new information relating to the casks was made available to the public.
 
 
 14
 On December 30, 1992, petitioner Kelley communicated to respondent Selin, the NRC chairman, his request that the NRC hold a public adjudicatory hearing regarding the location of the casks, pursuant to Sec. 189 of the AEA. His request was refused by the NRC, which claimed that such a hearing was unnecessary in a generic rulemaking action not focused exclusively on Palisades. However, the agency did conduct a three-hour meeting during which Michigan citizens were permitted to make oral statements. Although NRC officials were available for comment, no opportunity was afforded the speakers to question either the manufacturer's or Consumers' representatives. The director of the NRC's Office of Nuclear Material Safety remarked at the meeting that the agency action at issue was a generic rulemaking and that the Palisades plant was the first reactor to use the new casks but that at least two other reactors planned to utilize the new system.
 
 
 15
 As part of the proposed amendment adding the VSC-24 cask to the list of approved containers, the NRC stated that it had prepared an environmental assessment report relating to the proposed rule. The five-page report, which was explicitly tiered on prior environmental analyses relating to spent fuel storage, concluded that the casks would have no significant impact on the human environment. Some concerns were voiced to the NRC that it had failed to address any of the site-specific concerns relating to the Palisades location, but the NRC responded that no site-specific environmental analysis was required because the proposed amendment was generic and was not specifically aimed at Palisades.
 
 
 16
 On September 9, 1992, Consumers advised the NRC that the fuel permitted to be stored in the VSC-24 cask pursuant to the provisional certificate of compliance was incompatible with the spent fuel generated at Palisades. The fuel requirements in the final certificate were later amended. In October 1992, Consumers submitted to the NRC proposed changes to the Palisades security plan necessitated by the use of the VSC-24 casks. In January 1993, the NRC met with Consumers officials to discuss the delay in adoption of the final rule. Consumers informed the NRC that if the rule were not approved by May 1993, it would be unable to maintain full capacity at Palisades and would be forced to reduce the plant's power output. The NRC director of operations raised this issue with the NRC commissioners before the final rule was approved.
 
 
 17
 In February 1993, Consumers submitted an additional set of revisions to the Palisades security plan. On April 29, 1993, Consumers submitted for approval and revision an emergency plan related to the VSC-24 casks. The NRC later determined that the emergency plan was acceptable. That finding was not subject to public comment.
 
 
 18
 On April 7, 1993, the NRC published its final rule adding the VSC-24 cask to the list of dry storage containers approved for use at any reactor site in the United States. The rule became final on May 7, 1993. Along with the rule, the NRC issued a Safety Evaluation Report comparing the cask's design to regulatory requirements and a certificate of compliance. The agency also included in the Federal Register a lengthy statement providing technical and legal responses to comments on the VSC-24 cask.
 
 
 19
 Since the rule approving use of the cask became effective, Consumers has loaded two VSC-24 casks with spent fuels from the Palisades fuel pool and has placed the casks on the concrete storage pad at the Palisades site.
 
 B.
 
 20
 On May 4, 1993, before the NRC rule became final, petitioners Kelley, Read, Perman and Lake Michigan Federation filed a four-count complaint in the district court against the NRC and its commissioners seeking preliminary injunctive relief. Petitioners also sought a temporary restraining order to prevent the rule from becoming effective and to prohibit Consumers from loading spent fuel into the VSC-24 casks. Petitioners alleged that the NRC had failed to comply with the NEPA by refusing to prepare an environmental impact statement or assessment considering concerns specific to the Palisades location and that the environmental assessment relating to the adoption of the amendment to Subpart K, 10 C.F.R. Sec. 72.214, was deficient. Consumers was granted leave to intervene without objection.
 
 
 21
 The district court dismissed the action on May 10, 1993, at which time loading of the casks had already begun, finding that jurisdiction properly resided in the court of appeals. The district court then transferred the case to this court as No. 93-1646. Petitioners subsequently filed a motion for an emergency stay with this court. We denied the motion on May 17, 1993, holding that petitioners had not satisfied the requirements for a stay. On the same day, petitioners filed an appeal from the district court's dismissal for lack of subject matter jurisdiction, which was docketed in this court as No. 93-1710.
 
 
 22
 Petitioners Kelley and Lake Michigan Federation filed a motion with the NRC on May 24, 1993, seeking a stay of the effectiveness of the rule, or in the alternative, the rescission of the VSC-24 cask rule. The NRC's executive director of operations denied the request for a stay and held the request for rescission in abeyance. On June 4, 1994, petitioners Kelley, Lake Michigan Federation and Don't Waste Michigan filed a petition for review of the final rule adding the VSC-24 cask to the list of approved storage facilities. The appeal was docketed as No. 93-3613. After respondents NRC and Consumers filed motions to dismiss the petition for review, petitioners Kelley and Lake Michigan Federation filed an amended supplemental petition for review, which was docketed as No. 93-3749. This court denied the motions to dismiss and consolidated all the actions for review.
 
 II.
 A.
 
 23
 Intervenor Consumers argues that petitioners lack standing to maintain their action. Specifically, Consumers asserts that petitioners Read, Perman, and Kimmelman, suing as owners of land near the Palisades plant, no longer have standing because they are parties only to the two actions originating in the district court and because those claims have become moot. According to Consumers, Petitioner Kelley, acting as attorney general for the state of Michigan, lacks standing because he is improperly pursuing this matter on behalf of Michigan residents in a type of parens patriae action that is not permitted against the federal government. Finally, Consumers argues that the two membership organizations petitioning the court, the Lake Michigan Federation and Don't Waste Michigan, lack standing because the organizations have failed to allege any concrete interests of their members that have been injured by respondents' actions.
 
 
 24
 The issue of standing is a matter of law which we review de novo. Michigan v. United States, 994 F.2d 1197, 1202 (6th Cir.1993). In order to determine whether petitioners have standing, we " 'accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party.' " Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 109, 99 S.Ct. 1601, 1613, 60 L.Ed.2d 66 (1979) (quoting Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)).
 
 
 25
 To establish standing, a party must demonstrate a personal stake in the outcome of the dispute. In this case, petitioners must show that they have suffered some actual or threatened injury as a result of conduct by respondents, that the injury is traceable to the challenged action and that the injury can be redressed by a decision in their favor. Michigan v. United States, 994 F.2d at 1203 (citing Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted)). Moreover, the interest being asserted must be "within the zone of interests to be protected or regulated by the statute ... in question." Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). It is not necessary that every injury asserted by petitioners be sufficiently concrete to satisfy these requirements; it is enough if some of the injuries claimed are, or result in, clearly adverse effects on petitioners. Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 73, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).
 
 
 26
 Petitioners' injury must be "distinct and palpable," Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); Lugo v. Miller, 640 F.2d 823, 827 (6th Cir.1981), not merely a hypothetical or imagined detriment. Linton v. Commissioner of Health and Env't, 973 F.2d 1311, 1316 (6th Cir.1992). That petitioners disagree with respondents is not by itself enough to establish standing. Linton, 973 F.2d at 1316 (citing Diamond v. Charles, 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986)). Moreover, petitioners may not rely on their prior intervention before the NRC as the sole basis for claiming standing. "The mere fact that [petitioner] was permitted to intervene before the Commission does not entitle it to institute an independent suit to set aside the Commission's order in the absence of resulting actual or threatened legal injury to it." Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 486, 50 S.Ct. 378, 381, 74 L.Ed. 980 (1930). See also Center for Auto Safety v. National Highway Traffic Safety Admin., 793 F.2d 1322, 1329 n. 41 (D.C.Cir.1986) (finding organization's participation in agency rulemaking procedure insufficient basis on which to rest standing for an independent action); Chemehuevi Tribe of Indians v. Federal Power Comm'n, 489 F.2d 1207, 1242 n. 12 (D.C.Cir.1973) (reviewing standing despite participation in agency proceedings), vacated and remanded on different grounds, 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975).
 
 
 27
 Consumers alleges that petitioners Read, Perman and Kimmelman lack standing because they are parties only to the actions relating to the district court proceedings, No. 93-1710 and No. 93-1646. Consumers asserts that the appeal from the district court decision, No. 93-1710, has been abandoned and that, in addition, both Nos. 93-1646 and 93-1710 have been rendered moot by the passage of the NRC's final rule. Because the relief initially sought was an order enjoining the NRC from taking steps to allow loading of the VSC-24 casks at Palisades and because the rule now allows Consumers to begin loading without any further action by the NRC, Consumers alleges that the basis for petitioners' claims has disappeared. We disagree with Consumers and conclude that petitioners Read, Perman, and Kimmelman have standing.
 
 
 28
 Consumers bases its conclusion that petitioners have abandoned their appeal of the district court's decision on the statement in petitioners' brief that "even though the District Court erred, this Court need not reverse the District Court to find for Petitioners on their NEPA claims because the merits of all of Petitioners' NEPA claims are now before this Court...." Petitioners' Brief at 40 n. 9. This language, properly interpreted, does not evidence petitioners' abandonment of the claim but indicates that petitioners believe they have alternate grounds on which this court could rule. In addition, we have previously concluded that "all parties are now before this court." 8/10/93 Order of this Court.[2]
 
 
 29
 Having concluded that petitioners have not abandoned their claims under No. 93-1710, we must examine whether, as argued by Consumers, the two actions relating to the district court proceedings have been rendered moot by the passage of the NRC's final rule. The NRC rule has become final but only after the NRC took action to promulgate the rule, action that petitioners allege violates their procedural rights. The mere fact that the rule has gone into effect does not imply that petitioners' request for redress is a nullity. This is so because passage of the final rule does not eliminate the issue of whether respondent improperly took steps to implement that rule. See, e.g., Porter v. Lee, 328 U.S. 246, 251-52, 66 S.Ct. 1096, 1099-1100, 90 L.Ed. 1199 (1946) (finding action to restrain tenant's eviction not moot by reason of tenant's vacation of the premises); Symington Wayne Corp. v. Dresser Indus., Inc., 383 F.2d 840, 842 (2d Cir.1967) (holding that appeal from preliminary injunction against tender offer was not mooted by expiration of the offer). Furthermore, to find these actions moot as a result of the enactment of the NRC rule would require dismissal of petitioners' claims on the basis of inaction by respondent. By simply allowing the rule to become final without responding to petitioners, respondents would have been allowed to circumvent the procedural rules with which petitioners argue they must comply.
 
 
 30
 Assuming, as we must, that petitioners are asserting viable claims, the likely remedy would include exactly the relief petitioners seek. The language of the complaint indicates that while petitioners did originally seek an injunction or other restraint on further action allowing loading or storage of waste in the VSC-24 casks at Palisades, petitioners also sought "such other relief as this court deems proper." J.A. 48, 50. Petitioners asked the court to stop these actions "until Defendants fully explore all of the environmental impacts," J.A. 51, and "until Defendants have prepared an adequate EA." J.A. 53. Phrased this way, petitioners' claims might be conceived as continuing harms, against which action may still be taken to prohibit use of the VSC-24 cask at Palisades. It is not absolutely clear that " 'there is no reasonable expectation that the wrong will be repeated.' " United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). See also Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 170, 173 (D.D.C.1972) (finding that burden of showing mootness is a heavy one). Had the NRC published a new rule using the procedures petitioners assert are proper, the promulgation of that rule might have rendered this action moot. However, in the absence of such action, we cannot conclude that petitioners' claims are moot, and we hold that the cases numbered 93-1646 and 93-1710 involve a live controversy.
 
 
 31
 Petitioners Read, Perman, and Kimmelman have alleged sufficient injury to establish standing. Each owns land in close proximity to the Palisades plant and the proposed site for spent fuel storage. The petitioners have asserted a personal stake in the outcome of the litigation by virtue of their ownership and use of their property for residential and leisure pursuits. Not only do petitioners assert harm to their aesthetic interests and their physical health, but each also asserts that the value of his or her property will be diminished by the storage of nuclear waste in the VSC-24 casks at Palisades. Thus, petitioners' claims are sufficient to establish standing. See Lujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2142, 119 L.Ed.2d 351 (1992) (noting that the claim at issue was "not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (e.g., ... the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them)"). Petitioners are clearly asserting a threatened injury. The injury can be fairly traced to respondents' actions since petitioners allege that it is the storage of spent nuclear fuels in the VSC-24 cask that has the potential to interrupt enjoyment of their lakefront property and to diminish its value. Finally, a decision in their favor could redress the threatened harm. While the NRC rule being challenged has become effective, resolution of this action in petitioners' favor could reverse that decision, at least until proper procedures are followed.
 
 
 32
 It is not necessary for this court to determine that each petitioner in the four actions consolidated in this appeal has standing; it is enough that one petitioner may properly assert his claim. Because petitioners Read, Perman, and Kimmelman have standing, it is not necessary for us to address the standing of the remaining petitioners, Attorney General Kelley, Don't Waste Michigan and Lake Michigan Federation. See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); Doe v. Bolton, 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201 (1973).
 
 B.
 
 33
 Petitioners argue that the NRC violated Sec. 189(a) of the Atomic Energy Act, 42 U.S.C. Sec. 2239(a)(1)(A), by denying their request for an adjudicatory hearing concerning the storage of nuclear waste in VSC-24 casks at Palisades. Specifically, petitioners assert that NRC's addition of the VSC-24 storage cask to the list of approved storage systems at 10 C.F.R. Sec. 72 (Subpart K), via generic rulemaking, constituted an attempt "to shut Petitioners out of any meaningful public participation on the question of whether the NRC should allow Consumers to store its waste outdoors at Palisades in a never-before-used or fully tested concrete cask within yards of the Lake Michigan shoreline." Appellants' Brief at 21. Petitioners further assert that they are only seeking an opportunity for a hearing in order to dispute issues that are site-specific in relation to the use of the VSC-24 cask at Palisades. Appellants' Brief at 37-38.
 
 
 34
 Section 189(a) of the Atomic Energy Act of 1954 states in relevant part:
 
 
 35
 In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees, ... the [Nuclear Regulatory] Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.
 
 
 36
 42 U.S.C. Sec. 2239(a)(1)(A). Furthermore, Sec. 10154 of the Nuclear Waste Policy Act of 1982 ("NWPA"), provides in relevant part:
 
 
 37
 (a) Oral argument
 
 
 38
 In any Commission hearing under section 189 of the Atomic Energy Act of 1954 (42 U.S.C. 2239) on application for a license, or for an amendment to an existing license, filed after January 7, 1983, to expand the spent nuclear fuel storage capacity at the site of a civilian nuclear power reactor, through the use of ... dry storage capacity, or by other means, the Commission shall, at the request of any party, provide an opportunity for oral argument with respect to any matter which the Commission determines to be in controversy among the parties....
 
 
 39
 (b) Adjudicatory hearing
 
 
 40
 (1) At the conclusion of any oral argument under subsection (a) of the section, the Commission shall designate any disputed question of fact, together with any remaining questions of law, for resolution in an adjudicatory hearing only if it determines that--
 
 
 41
 (A) there is a genuine and substantial dispute of fact which can only be resolved with sufficient accuracy by the introduction of evidence in an adjudicatory hearing; and
 
 
 42
 (B) the decision of the Commission is likely to depend in whole or in part on the resolution of such dispute.
 
 
 43
 * * * * * *
 
 
 44
 (c) Judicial review
 
 
 45
 No court shall hold unlawful or set aside a decision of the Commission in any proceeding described in subsection (a) of this section because of a failure by the Commission to use a particular procedure pursuant to this section unless--
 
 
 46
 (1) an objection to the procedure used was presented to the Commission in a timely fashion or there are extraordinary circumstances that excuse the failure to present a timely objection; and
 
 
 47
 (2) the court finds that such failure has precluded a fair consideration and informed resolution of a significant issue of the proceeding taken as a whole.
 
 
 48
 42 U.S.C. Sec. 10154.
 
 
 49
 In order to prevail on a claim that the NRC is bound to conduct its proceedings in a particular manner, a petitioner "must point to a statute specifically mandating that procedure, for 'absent constitutional constraints or extremely compelling circumstances' courts are never free to impose on the NRC (or any other agency) a procedural requirement not provided for by Congress." Union of Concerned Scientists v. United States Nuclear Regulatory Comm'n, 920 F.2d 50, 53 (D.C.Cir.1990) (quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978)). " '[I]f the statute is clear and unambiguous, "that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." ' " Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos., 498 U.S. 211, 223, 111 S.Ct. 615, 623, 112 L.Ed.2d 636 (1991) (quoting Sullivan v. Stroop, 496 U.S. 478, 482, 110 S.Ct. 2499, 2502, 110 L.Ed.2d 438 (1990)).
 
 
 50
 Although 42 U.S.C. Sec. 2239(a)(1)(A) provides that the Commission shall grant a hearing, "the Act itself nowhere describes the content of a hearing or prescribes the manner in which this 'hearing' is to be run." Union of Concerned Scientists, 920 F.2d at 53. Likewise, the NWPA, 42 U.S.C. Sec. 10154, provides for oral argument, but it does not describe the content of oral argument or prescribe how oral argument is to be conducted. See also Nuclear Information Resource Serv. v. Nuclear Regulatory Comm'n, 969 F.2d 1169, 1173 (D.C.Cir.1992) ("While [42 U.S.C. Sec. 2239(a)(1)(A) ] plainly requires a 'hearing upon request' ... it provides no unambiguous instruction as to how the 'hearing' is to be held; nor does it speak in any direct fashion to the question of whether the [NRC] must rehear issues already resolved...."). " 'The Court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration'.... '[A] contrary holding would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding.' " Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos., 498 U.S. at 228, 111 S.Ct. at 626 (quoting Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983)).
 
 
 51
 Furthermore, the courts are "obliged to defer to the operating procedures employed by an agency when the governing statute requires only that a 'hearing' be held." Union of Concerned Scientists, 920 F.2d at 54. "In fact, the D.C. Circuit has noted that the Atomic Energy Act of 1954 creates 'a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administrative agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives.' " Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n, 868 F.2d 810, 813 (6th Cir.1989) (quoting Siegel v. Atomic Energy Comm'n, 400 F.2d 778, 783 (D.C.Cir.1968)). As the Supreme Court has stated, "the [Nuclear Regulatory] Commission is making predictions ... at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) (citations omitted). After all, "[j]udges are neither scientists nor technicians." Lower Alloways Creek Township v. Public Serv. Elec. & Gas Co., 687 F.2d 732, 743 (3d Cir.1982). Moreover, such deference is especially applicable when the NRC is structuring its own rules of procedure and methods of inquiry. Vermont Yankee, 435 U.S. at 543, 98 S.Ct. at 1211. See also Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n, 679 F.2d 1218, 1223 (7th Cir.1982) ("Our job is to assure that the Commission complies with the specific statutes and regulations applicable to its regulatory activities.... Beyond that our power to review an agency's decision not to initiate a proceeding is extremely limited. We would exercise it only if we were strongly convinced that the Commission was inexcusably defaulting on its fundamental responsibility to protect the public safety from nuclear accidents."). Accordingly, a decision of the NRC "may not be overturned unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " In re Three Mile Island Alert, Inc., 771 F.2d 720, 727 (3d Cir.1985) (quoting 5 U.S.C. Sec. 706(2)(A) (1988)), cert. denied, 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 717 (1986).
 
 
 52
 Furthermore, the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. Secs. 4321 to 4361, also impacts upon the NRC's decision in this case. NEPA requires that federal agencies prepare a "detailed statement," known as an environmental impact statement ("EIS"), for every major federal action "significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C). The EIS must address "any adverse environmental effects" of the projects and "alternatives to the proposed action." Id. However, the duties which NEPA imposes upon federal agencies are "essentially procedural." Vermont Yankee, 435 U.S. at 558, 98 S.Ct. at 1219.
 
 
 53
 "Although NEPA requires the [NRC] to undertake 'careful consideration,' of environmental consequences, ... [the NRC] may issue a rulemaking to address and evaluate environmental impacts that are 'generic;' " namely, neither plant-specific nor site-specific. Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n, 869 F.2d 719, 723 (3d Cir.1989) (quoting Baltimore Gas, 462 U.S. at 98, 103 S.Ct. at 2253). Under NEPA, " '[t]he role of the courts ... is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.' " Id. at 723 (quoting Baltimore Gas, 462 U.S. at 97-98, 103 S.Ct. at 2252).
 
 
 54
 "NEPA does not require agencies to adopt any particular internal decisionmaking structure." Baltimore Gas, 462 U.S. at 100, 103 S.Ct. at 2254. Furthermore, "[w]hile NEPA clearly mandates that an agency fully consider environmental issues, it does not itself provide for a hearing on those issues." Union of Concerned Scientists, 920 F.2d at 56. Thus, "[t]he generic method chosen by the [NRC] is clearly an appropriate method of conducting the hard look required by NEPA." Baltimore Gas, 462 U.S. at 101, 103 S.Ct. at 2254.
 
 
 55
 In this case, the NRC's denial of petitioners' request for an adjudicatory hearing concerning the storage of spent nuclear fuel in VSC-24 casks at Palisades was neither arbitrary, capricious, an abuse of discretion, nor otherwise not in accordance with the law. In the rulemaking at issue here, the NRC amended 10 C.F.R. Sec. 72.214, adding the VSC-24 cask to the list of spent fuel storage which nuclear power reactor licensees may use pursuant to the provisions of their general license.
 
 
 56
 The public had an extensive opportunity to comment on the proposed amendment to 10 C.F.R. Sec. 72.214 and the suitability of the VSC-24 cask for the dry storage of spent nuclear fuels. Further, this opportunity for public comment included an extended period of public comment on the proposed addition of the VSC-24 cask to the list of approved dry storage casks in 10 C.F.R. Sec. 72.214. After the NRC published its notice of intent to add the VSC-24 cask to the list of approved casks, the NRC provided a 75-day period for public comment, and the initial period of public comment was followed by an additional period for public comment after new information concerning the VSC-24 casks was made available to the public. NRC's addition of the VSC-24 cask to the list of approved dry storage containers did not become final until May 7, 1993.
 
 
 57
 Moreover, during the period of public comment, the NRC conducted a three-hour meeting at which Michigan citizens were permitted to make oral statements about the VSC24 casks. The oral statements made by Michigan residents did include comments about the site-specific use of the VSC-24 casks at Palisades and, most particularly, comments about the effects of the severe freeze-thaw cycle in Michigan on the concrete containers for the casks as well as comments about the fact that the concrete pad for the casks at Palisades was to be built on or near dunes on the Lake Michigan shoreline.
 
 
 58
 Thus, petitioners' assertion that the NRC attempted to shut them out of meaningful participation on the question of the use of the VSC-24 casks is meritless. As earlier stated, the NRC provided a period of public comment on the use of the VSC-24 casks, and it also held a three-hour "hearing" at which Michigan citizens were able to raise their concerns about the use of the VSC-24 casks at Palisades. In this case, what petitioners are really seeking is to have this court use its power of judicial review of NRC actions to micromanage NRC decisionmaking and, in particular, dictate to the agency the procedure which it must use in approving designs for containers for the dry storage of spent nuclear fuel.
 
 
 59
 However, as noted above, NRC decisionmaking, and in particular the procedure used by the agency in the course of its decisionmaking, is entitled to substantial deference by this court. Although the NRC denied petitioners' request for an adjudicatory hearing concerning the use of the VSC-24 casks at Palisades, the NRC did hold a "hearing" at which Michigan citizens were able to comment. The applicable statute, 42 U.S.C. Sec. 2239(a)(1)(A), provides for a "hearing," but does not provide for any particular format for this hearing. Further, nothing in the applicable statutes or the relevant precedents compels the NRC to hold a formal adjudicatory hearing.
 
 
 60
 Furthermore, the approval of the design of containers for the dry storage of spent nuclear fuel, such as the VSC-24 cask, is exactly the type of NRC decision which may be the subject of generic rulemaking. The NWPA states in relevant part:
 
 
 61
 The Secretary [of Energy] shall establish a demonstration program, in cooperation with the private sector, for the dry storage of spent nuclear fuel at civilian nuclear power reactor sites, with the objective of establishing one or more technologies that the [Nuclear Regulatory] Commission may, by rule, approve for use at the sites of civilian nuclear power reactors without, to the maximum extent practicable, the need for additional site-specific approvals by the Commission.
 
 
 62
 42 U.S.C. Sec. 10198 (emphasis added). In this instance, the design of technology for the dry storage of spent nuclear fuels, such as the VSC-24 cask, is the type of decision which does not require case-by-case consideration. Indeed, to require the NRC to evaluate the alternatives for the dry storage of spent nuclear fuel on a case-by-case basis "would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding." Mobil Oil, 498 U.S. at 228, 111 S.Ct. at 626.
 
 
 63
 More importantly, the NRC's certificate of compliance for the VSC-24 casks, like the certificates of compliance for the other dry storage technologies listed in 10 C.F.R. Sec. 72.214, contains a lengthy list of conditions of system use for operation of the VSC-24. J.A. 702-39. This extensive list of conditions for use of the VSC-24 cask will virtually eliminate the need for site-specific consideration concerning the use of the VSC-24 cask, since the various licensees of civilian nuclear power generating facilities will be able to determine from the conditions of system use for the VSC-24 cask whether it is possible to use the cask at the site of their nuclear power generating facility. Furthermore, in finding that the approval of designs for casks for the dry storage of spent nuclear fuel was particularly amenable to generic rulemaking, the NRC stated:
 
 
 64
 An important consideration is that free-standing casks, being very strong and massive structures, are independent of the effects of site-specific natural phenomena.... Importantly, site-specific approvals would not be required by the Commission, provided conditions in subpart K are met.
 
 
 65
 55 Fed.Reg. 29,186; J.A. 454.
 
 
 66
 Finally, petitioners also attach significance to the fact that the NRC granted Pacific Sierra, the vendor of the VSC-24 cask, an exemption that permitted the fabrication of a limited number of casks for Consumers prior to the issuance of the Certificate of Compliance for the VSC-24 cask. However, the mere grant of an exemption to begin fabricating the casks does not trigger a right to an adjudicatory hearing on the part of petitioners. Most importantly, although the NRC granted a limited exemption to Pacific Sierra for the fabrication of the VSC-24 casks for Consumers, Consumers did not begin to load or use the VSC-24 casks until after the Certificate of Compliance for the VSC-24 cask was issued by the NRC on May 7, 1993. Further, petitioners have pointed to no facts which would indicate that the VSC-24 casks currently in use at Palisades do not comply with the conditions for use set forth in the Certificate of Compliance for the VSC-24 cask.
 
 C.
 
 67
 Petitioners argue that respondents made several key site-specific decisions regarding use of the VSC-24 cask at Palisades without granting the public the right to express concerns about the issues involved. Even if the NRC's promulgation of its final rule amounts to a generic rulemaking, petitioners contend that the agency cannot use the shield of such a rulemaking as protection from the requirement that it grant hearing rights with regard to site-specific determinations. Petitioners claim several instances of site-specific decisionmaking by the NRC, including the agency's grant of an exemption to Pacific Sierra to allow construction of the VSC-24 before the certificate of compliance was issued and the NRC's approval of amendments to Palisades' security and emergency plans. We have already upheld the NRC's promulgation, through a generic rulemaking proceeding, of the final rule adding the VSC-24 cask to the list of approved storage containers.
 
 
 68
 We now turn to the question of whether respondents made decisions narrowly tailored to apply only to Palisades, decisions that amount to site-specific determinations. Petitioners claim that the rulemaking procedure at issue was, in fact, a "joint effort by the NRC, the utility [Consumers], and the cask manufacturer to expedite the use of the VSC-24 cask at Palisades." Petitioners' Brief at 26. Petitioners object to this collaboration and assert that, pursuant to 42 U.S.C.A. Sec. 2239 (AEA Sec. 189(a)), "[p]ublic participation is automatic with respect to all [NRC] actions that are potentially harmful to the public health and welfare." Bellotti v. United States Nuclear Regulatory Comm'n, 725 F.2d 1380, 1383 (D.C.Cir.1983). However, the authority on which petitioners rely to establish this point does not mandate the sweeping hearing rights petitioners are seeking as a result of the decisions allegedly made by the NRC. Petitioners are correct in asserting that Sec. 189(a) of the AEA provides that
 
 
 69
 [i]n any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding....
 
 
 70
 However, the Bellotti court made clear that not every proposed action falls under this provision; the right to automatic participation applies only when the agency acts in a matter provided for in Sec. 189(a), which includes matters generally concerned with the licensing process. Moreover, the Commission has the authority and discretion to control Sec. 189(a) proceedings in order to avoid "turning focussed regulatory proceedings into amorphous public extravaganzas." Bellotti, 725 F.2d at 1382. If the Commission did not have such authority, and public participation were automatically required for any agency action, the public would be entitled to an unrestrained platform that would disable the Commission and effectively prevent it from taking any action. Bellotti, 725 F.2d at 1382. See also Union of Concerned Scientists v. United States Nuclear Regulatory Comm'n, 920 F.2d 50, 53 (D.C.Cir.1990) (noting that courts may not impose on agencies procedural requirements not permitted by Congress) (citing Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978)). Nonetheless, even though petitioners are not automatically entitled to a hearing pursuant to Sec. 189(a), they are not without recourse. If petitioners wish to litigate these issues, which are beyond the scope of required proceedings, they may file a petition with the Commission pursuant to 10 C.F.R. Sec. 2.206. The Commission may not deny such a petition arbitrarily. Bellotti, 725 F.2d at 1383.
 
 
 71
 In Union of Concerned Scientists, the Court of Appeals for the District of Columbia limited the NRC's power to prevent parties from raising issues in Sec. 189(a) hearings but only to the extent that parties may not be denied a hearing on an issue the Commission agrees is material to its licensing decision. Union of Concerned Scientists, 920 F.2d at 55. There is no licensing decision being made here. The NRC's actions, while they may have benefitted Consumers and Palisades, were not directed toward licensing the facility. The decisions to which petitioners refer as site-specific do not grant Consumers the right to operate Palisades in any greater capacity than the plant had previously been allowed to operate, and the NRC did not exempt Consumers from operating under any specific safety requirements or change the rules applicable to Consumers to such an extent that it no longer followed otherwise applicable NRC rules and regulations. See Massachusetts v. United States Nuclear Regulatory Comm'n, 878 F.2d 1516, 1520-21 (1st Cir.1989). Petitioners cannot support a claim that the NRC has been hesitant to require licensing amendments when circumstances indicated they were necessary. In two nuclear plants in which equipment was inadequate to handle the proposed cask system, the NRC amended the operators' licenses in order to require different equipment. See, e.g., 56 Fed.Reg. 60,118 (Prairie Island Nuclear Generating Plant); 56 Fed.Reg. 37,577 (Calvert Cliffs Nuclear Power Plant).
 
 
 72
 Under the present regulatory scheme, licensees are required to review their operations and facilities and determine whether technical changes are required or unreviewed safety questions are present that would require an amendment to the reactor's operating license. See 54 Fed.Reg. 19,379 and 19,381; 55 Fed.Reg. 29,181 and 29,183; 58 Fed.Reg. 17,948 and 17,951. Petitioners argue that the NRC's use of this approach belies the fact that site-specific decisions are being made and comes perilously close to self-regulation. However, this approach is consistent with the NRC's historical method of regulation, which has long allowed licensees to make initial determinations about changes to their facilities and has enabled the agency to retain its enforcement power. 10 C.F.R. Sec. 50.59. The record does not support petitioners' suggestion that the NRC blindly listens to the "self serving" assertions of licensees. NRC inspection activity "provides a feedback mechanism and an independent verification of the effectiveness of the licensee's implementation of its programs...." 56 Fed.Reg. 64,943, 64,951-52.[3]
 
 
 73
 Petitioners assert that the references in the NRC's final rule and comments to Consumers' (1) analysis of load-handling activities, (2) evaluations of whether the storage pads were designed to adequately support the weight of the casks, and (3) determinations of whether the reactor site's characteristics would permit the use of the casks as designed were improperly accepted by respondents without affording members of the public the chance to participate in the controversy. This is not correct. The evaluations submitted by Consumers were merely the manner by which the utility sought to comply with NRC regulations and specifications. The public had an opportunity to be heard when the agency first considered the new rule and began a public comment period. In fact, the original comment period was extended after the release of new information in the public domain. Members of the public with concerns about the new casks were aware of the factors the agency would be taking into consideration in issuing the certificate of compliance and had a chance to voice their concerns. Their opportunity to comment was not denied. Furthermore, petitioners' reliance on United States Lines, Inc. v. Federal Maritime Comm'n, 584 F.2d 519, 540 (D.C.Cir.1978), and National Wildlife Fed'n v. Marsh, 568 F.Supp. 985, 993 (D.D.C.1983), is misplaced. Those cases deal with instances in which the agency failed to disclose the rationale behind its actions prior to the conclusion of the public comment period. Here petitioners knew of the agency's concerns and had an opportunity to express their own.
 
 
 74
 Petitioners attempt to argue that if the NRC has merely accepted the licensee's technical and safety reviews without making site-specific determinations, its actions amount to active avoidance of public participation. If this is the case, petitioners assert that the NRC has shirked its responsibility under the AEA to assure that no actions are taken that are detrimental to the health and safety of the public, 42 U.S.C. Sec. 2133(d), and has impermissibly delegated its regulatory power to private individuals. Petitioners fail to note, however, that the evaluations submitted by Consumers were in response to the conditions on use specified in the certificate of compliance issued by the NRC. In addition, the AEA endows the NRC with significant discretion to determine the information that is necessary to support the factual findings of the agency during the licensing process. See, e.g., 42 U.S.C. Sec. 2232(a). Finally, no grounds exist for petitioners' claim that certain unreviewed issues persisted as to which members of the public were denied the right to be heard. The NRC had clearly reviewed the issues. As an example, respondents point to the response by the NRC to one commenter's claim that the issue of loading procedures constituted an unreviewed safety issue. In its answer to the commenter, the agency detailed the procedures required in the certificate of compliance and explained the review conducted by Consumers. Contrary to petitioners' suggestion, this case does not present " 'a situation ... where the agency has "consciously and expressly adopted a general policy" [of non-enforcement] that is so extreme as to amount to an abdication of its statutory responsibilities.' " Safe Energy Coalition v. United States Nuclear Regulatory Comm'n, 866 F.2d 1473, 1477 (D.C.Cir.1989) (quoting Heckler v. Chaney, 470 U.S. 821, 833 n. 4, 105 S.Ct. 1649, 1656 n. 4, 84 L.Ed.2d 714 (1985)).
 
 
 75
 To support their theory that respondents have worked together to make sitespecific determinations cloaked in the terms of a generic rulemaking, petitioners rely on the NRC's grant of permission to Pacific Sierra to allow construction of a limited number of the VSC-24 casks to be used at Palisades prior to the issuance of the certificate of compliance, which evades the requirements of Subpart L. 10 C.F.R. Sec. 72.234(c). Petitioners argue that this exemption was granted only in response to the agency's recognition that the original certification schedule could not be met and that it indicated that the NRC's push to promulgate the new rule was a result of needs specific to Palisades. Respondents correctly point out, however, that the exemption notice was published in the Federal Register, not issued in secret. 56 Fed.Reg. 41,870. In addition, the exemption allowed the construction, not the loading, of the casks prior to the issuance of the certificate of compliance. The NRC's action was consistent with the Congressional intent evidenced in the NWPA, which grew out of concern that civilian reactors were running out of storage space for their radioactive wastes. The NRC's decision was not one made to specifically benefit Palisades but one intended to allow a utility, which happened to be Consumers, to be prepared to use a new technology to meet critical storage needs in the event of formal adoption of the amendment to 10 C.F.R. Sec. 72. Petitioners have failed to demonstrate that had another utility been the first in line to use the casks, the NRC would not have made the same decision.[4] Moreover, we note that the grant of an exemption from a generic requirement does not constitute an amendment to the reactor's license that would trigger hearing rights. Massachusetts v. United States Nuclear Regulatory Comm'n, 878 F.2d 1516, 1520-21 (1st Cir.1989). See also Duke Power Co. v. Nuclear Regulatory Comm'n, 770 F.2d 386, 389 (4th Cir.1985) (noting that the parties had agreed that no amendment was involved in the exemption decision).
 
 
 76
 Petitioners also point to the NRC's approval of revised security and emergency plans for Palisades as evidence that site-specific decisions were made. Consumers first submitted revisions to its security plan in October 1992, indicating to the NRC that the changes were necessitated by modification of the plant area for construction of an independent spent fuel storage installation. Changes to the emergency plan were submitted in April 1993. These changes, Consumers claimed, were required to increase the plant's ability to detect accidents with the casks and to plan the actions to be taken in response to such accidents. The NRC approved these revisions on May 10, 1993, finding that the revisions would not degrade the effectiveness of the plant's emergency planning. Petitioners claim that this decision was site-specific to Palisades. The NRC had already addressed this issue, however, in its comments accompanying the final rule. "[T]hese requirements for license reviews do not constitute requirements for Commission approval prior to cask use; that is, no Commission findings with respect to these reviews are needed prior to use of the casks." 55 Fed.Reg. 29,181, 29,183. Without an amendment to the operating license, revisions made merely to increase the safety of the reactor do not require public participation. Bellotti, 725 F.2d at 1383.
 
 
 77
 Finally, petitioners support their arguments by analogy to the NRC's scheme regarding issuance of construction permits and operating licenses. Pursuant to those regulations, the NRC certifies standard designs for reactors through a rulemaking procedure. 10 C.F.R. Sec. 52. The NRC does not hold new hearings on the precertified designs when a utility seeks to invoke a plan but does hold hearings and make findings on the linkage between the design and site-specific design elements. Nuclear Information Resource Serv. v. United States Nuclear Regulatory Comm'n, 969 F.2d 1169, 1171 (D.C.Cir.1992) (en banc). This scheme is entirely different from the approval process to which petitioners object. In this case, the NRC is not permitting construction of new facilities but is merely expanding the options for disposal of spent nuclear fuels. The 1990 rulemaking emphasized that the requirements for use of the approved storage systems would make them safe for all sites in the United States, without regard to particular local features. Moreover, certification of designs is not identical to the grant of a general license. Certification is a narrower procedure that approves designs in theory while the grant of a license is a broader form of permission. Thus, the analogy fails to support petitioners' contentions.
 
 D.
 
 78
 Petitioners argue that the NRC violated its obligations under NEPA by failing to conduct a site-specific environmental analysis concerning the use and operation of the VSC-24 casks at Palisades. Petitioners admit that "the NRC may rely on a generic environmental assessment regarding truly generic issues posed by the VSC-24 casks." Appellants' Brief at 42-43. However, petitioners assert that since "use of the VSC-24 cask involves the potential for a 'site-specific' impact different from those analyzed generically, a site-specific analysis is required as a matter of law and logic." Appellants' Brief at 43. Further, petitioners assert that "the NRC also failed to consider a reasonable range of alternatives to the storage of waste at Palisades." Appellants' Brief at 44.
 
 
 79
 As part of the final rule adding the VSC-24 cask to the list of approved casks in 10 C.F.R. Sec. 72.214, the NRC stated that under the NEPA, "the Commission has determined that this rule is not a major Federal action significantly affecting the quality of the human environment and, therefore, an environmental impact statement is not required." J.A. 321. Thus, the NRC prepared an environmental assessment ("EA") for 10 C.F.R. Part 72 rather than an EIS. As part of its EA, the NRC stated:
 
 
 80
 The Staff's evaluation has led to the conclusion that the proposed revisions to 10 C.F.R. Part 72, if promulgated, would not result in any activity that significantly affects the quality of the human environment. Promulgation of these revisions is not a major federal action significantly affecting the quality of the human environment within the meaning of NEPA.
 
 
 81
 J.A. 342. Further, in the EA the NRC also stated:
 
 
 82
 Incremental impacts caused by the operation of dry cask storage of spent fuel under a general license are not considered significant. No effluents are expected from the sealed dry storage casks. However, activities associated with cask loading and decontamination may result in some small incremental liquid and gaseous effluent.... Incremental impacts under a general license are expected to be only a small fraction of that occurring from operation of the nuclear power station.
 
 
 83
 J.A. 467-68. Further, the NRC concluded that "the potential risk to the public health and safety due to accidents or sabotage is extremely small." J.A. 469. Finally, the EA states that "[b]ecause the Commission has determined that there are no significant environmental impacts associated with the proposed action, any alternative with equal or greater environmental impacts need not be evaluated." J.A. 470.
 
 
 84
 "An agency decision, based on an EA, that no EIS is required, can be overturned only if it is arbitrary, capricious, or an abuse of discretion." Crounse Corp. v. I.C.C., 781 F.2d 1176, 1193 (6th Cir.), cert. denied, 479 U.S. 890, 107 S.Ct. 290, 291, 93 L.Ed.2d 264 (1986). We will not "substitute our judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." Id. However, we will "determine whether the agency has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." Id. "[A]n agency's determination not to prepare an EIS must be 'reasonable under the circumstances,' when viewed 'in the light of the mandatory requirements and the standard set by (NEPA).' " Lower Alloways Creek Township v. Public Service Elec. & Gas Co., 687 F.2d 732, 742 (3d Cir.1982) (quoting Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1320 (8th Cir.1974)).
 
 
 85
 An environmental assessment is a "concise public document" prepared by a federal agency which serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. Sec. 1508.9.[5] The regulations also aid the agency's compliance with NEPA when no EIS is necessary. Id.
 
 
 86
 In this case, the NRC's reliance on the EA as well as its finding that an EIS is not required is neither arbitrary, capricious, nor an abuse of discretion. As noted, in the EA that the NRC prepared in conjunction with its 1990 Subpart K rulemaking, the agency found that its action would not be a major federal action significantly affecting the quality of the human environment and, therefore, no EIS was required. In its EA, the NRC analyzed (1) the radiological effects of the routine dry storage of spent nuclear fuel, (2) the non-radiological impacts of the routine dry storage of spent nuclear fuel, (3) the public health consequences of dry cask storage accidents, (4) the effects of radiological sabotage, and (5) the effects of decommissioning. The EA also noted that any alternative, especially an alternative licensed under site-specific licensing, would have similar environmental impacts. J.A. 464-69.
 
 
 87
 Further, in a 1984 Waste Confidence Decision, the NRC found "reasonable assurance, that, if necessary, spent fuel generated in any reactor can be stored safely and without significant environmental impacts for at least 30 years beyond the expiration of that reactor's operating licenses at that reactor's spent fuel storage basin, or at either onsite or offsite independent spent fuel storage installations." 49 Fed.Reg. 34,658 (1984); J.A. 411. In September 1990, in a review and final revision of its Waste Confidence Decision, the NRC reaffirmed its finding of reasonable assurance that spent fuel from a reactor could be stored without significant environmental impact either onsite or offsite for at least 30 years beyond the expiration of the operating licenses for the reactor. 55 Fed.Reg. 38,474 (1990). Furthermore, in its rulemaking governing applications for site-specific independent spent fuel storage installation licenses and Monitored Retrievable Storage facility licenses, the NRC found:
 
 
 88
 (1) past experience with water pool storage of spent fuel establishes the technology for long-term storage of spent fuel without affecting the health and safety of the public, (2) the proposed rulemaking to include the criteria of 10 CFR Part 72 for storing spent nuclear fuel and high-level radioactive waste does not significantly affect the environment.
 
 
 89
 53 Fed.Reg. 31,651, 31,658.
 
 
 90
 Furthermore, the NRC "tiered" its EA for the VSC-24 cask rulemaking on the numerous prior environmental reviews it had conducted with respect to the issue of onsite storage of spent fuel. The regulations of the Council on Environmental Quality, 40 C.F.R. Sec. 1508.28, recognize that tiering of environmental impact statements on environmental analyses is appropriate when the sequence of statements or analyses is:
 
 
 91
 (a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.
 
 
 92
 (b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement of analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.
 
 40 C.F.R. Sec. 1508.28
 
 93
 In this case, the environmental impacts of the construction and operation of the nuclear power plant at the Palisades site were analyzed in the Final Environmental Statement prepared by the AEC[6] at the time it decided to license the Palisades plant for operation. Furthermore, as noted previously, the NRC had also previously considered the environmental effects of the onsite dry storage of spent nuclear fuel at various nuclear power plant sites at the time it promulgated 10 C.F.R. Sec. 72 (Subpart K). Thus, it was appropriate for the agency to "tier" its environmental analysis at the time it decided to add the VSC-24 cask to the list of approved dry storage technologies at 10 C.F.R. Sec. 72.214.
 
 
 94
 Moreover, the decision in Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n, 869 F.2d 719 (3d Cir.1989), relied on by petitioners as support for their argument that a generic environmental analysis of the VSC-24 cask is not sufficient, is distinguishable from the facts of this case. The Third Circuit in Limerick held, among other things, that the NRC could not rely on an NRC policy statement to preclude consideration of "severe accident mitigation design alternatives" in a proceeding which was considering whether or not to issue a full power operating license for the Limerick Nuclear Power facility, which is located near Philadelphia, Pennsylvania. The Third Circuit acknowledged that pursuant to the Supreme Court's decision in Baltimore Gas, the "NRC may preclude consideration of generic issues by rulemaking." Id. at 733. The Third Circuit concluded that the decision in Baltimore Gas was not applicable to the situation before it because in Baltimore Gas the NRC was proceeding on the basis of a formal rulemaking, whereas the NRC was proceeding in its decision to license the Limerick power facility on the basis of an NRC policy statement. Id. at 736-37. The Third Circuit considered the distinction between a policy statement and a rule to be crucial, because (1) unlike a rule, a policy statement is not entitled to deference by the courts; and (2) when an agency applies a policy statement, it must be prepared to support the policy embodied in the policy statement as if the policy statement did not exist. Id. at 736-37.
 
 
 95
 However, unlike the situation in Limerick, it is undisputed that the NRC was not proceeding on the basis of a policy statement in its decision to add the VSC-24 to the list of approved dry storage systems for spent nuclear fuel. Furthermore, the Third Circuit's decision not to rely on a generic environmental analysis in Limerick was sensible because that proceeding involved the decision to grant an operating license to a nuclear power generating facility. However, in this case, an operating license had already been granted to the Palisades facility, and, as a result, an extensive environmental analysis of the Palisades site had already been performed.
 
 
 96
 In addition, petitioners claim that there are site-specific considerations unique to the Palisades facility, noting that a cask accident at Palisades would a have a different impact than a similar accident which occurred in Colorado. Appellants' Brief at 44. However, petitioners' argument ignores the fact that the addition of the VSC-24 cask to the list of approved casks in 10 C.F.R. Sec. 72.214 will allow the cask to be used only at reactor sites which have been the subject of a comprehensive environmental analysis by the NRC and which have been granted a license for reactor operations on the basis of that review. Furthermore, other than the conclusory statement in their brief on appeal that the Palisades site is "a uniquely sensitive ecosystem--a high-risk erosion area along the shoreline of Lake Michigan," Appellants' Brief at 39, petitioners have not identified, much less established, any factor requiring a site-specific analysis before the VSC-24 cask could be added to the list of approved casks.
 
 
 97
 Petitioners also assert that as part of its EA the NRC failed to consider alternatives to the dry storage of spent fuel in VSC-24 casks at Palisades. As part of its "Environmental Assessment and Finding of No Significant Impact" the NRC stated:The principal alternatives available to the NRC would be procedural in nature, whereby dry cask spent fuel storage could be approved under other existing or new Parts of Title 10, Code of Federal Regulations. Regardless of the method selected to approve such dry cask spent fuel storage, all would have similar environmental impacts.
 
 
 98
 The NWPA directed that the Commission approve one or more technologies, that have been developed and demonstrated by [the Department of Energy], for the use of spent fuel storage at the sites of civilian nuclear power reactors without, to the extent practicable, the need for additional site-specific review. The NWPA also directed that the Commission, by rulemaking, set forth procedures for licensing the technology. Regulations for accomplishing this are in place. Therefore, the no action alternative is not acceptable.
 
 
 99
 Alternative spent fuel storage technologies exist. However, at this time, the NRC considers them neither sufficiently demonstrated nor practicable for use under the general license provisions of Subpart K of 10 CFR Part 72 without additional site-specific reviews. If other storage technologies become more amenable to this type of action, they could be considered at a later time.
 
 
 100
 J.A. 744-45. Thus, the NRC did consider alternatives. Specifically, the NRC found the alternative technologies for spent fuel storage to have been neither sufficiently demonstrated nor practicable for use under a general license provision. As noted above, this type of technical decision by the NRC, operating at the frontiers of science, is entitled to great deference by the courts. Baltimore Gas, 462 U.S. at 103, 103 S.Ct. at 2255.
 
 
 101
 Furthermore, petitioners' argument is essentially an attack on the policy choice made by the Congress, and embodied in the NWPA, to have the NRC consider, to the extent practicable, the licensing of onsite spent nuclear fuel storage at civilian nuclear power facilities through rulemaking. If petitioners are to obtain such relief, it must come from the Congress, either in the form of the repeal or amendments to the NWPA, and not from the courts.
 
 
 102
 Finally, petitioners have made no pretense of their desire to use their attack on the NRC's approval of the VSC-24 cask design to force the NRC to decide to cease production of irradiated fuel at Palisades by halting the operation of the nuclear power generating reactor. See Affidavit of Marvin Resnikoff, J.A. at 58-59. Because no federal repository is as yet available for the permanent disposal of spent irradiated fuel from nuclear power plants and because the spent fuel pools at many nuclear power plants, including Palisades, are at or near their storage capacities, many civilian nuclear power generating facilities could be forced to shut down if no additional storage space for spent nuclear fuel is available. Id. However, the Congressional policy embodied in the NWPA was to provide to the NRC a basis to approve various dry storage technologies for use at civilian nuclear power reactors without site-specific hearings. To the extent that petitioners object to any action by the NRC that would permit the continued operation of the Palisades plant by providing additional storage capacity for spent fuel, rather than merely objecting to the use of the VSC-24 cask at Palisades, they must seek such relief from the Congress, as opposed to the NRC or the courts.
 
 
 103
 Thus, we conclude that in its environmental assessment of the rule adding the VSC-24 cask to the list of approved storage systems at 10 C.F.R. Sec. 72 (Subpart K), the NRC did take a "hard look" at the environmental consequences of its action, as required by NEPA. Therefore, the NRC's failure to prepare a site-specific environmental analysis concerning the use and operation of the VSC-24 casks at Palisades does not violate the NEPA.
 
 III.
 
 104
 For the reasons stated, the decision of the district court in case No. 93-1710 is AFFIRMED. The petitions for review in the remaining three cases, Nos. 93-1646, 93-3613, and 93-3749, are DENIED.
 
 
 
 [1]
 In 1989, the Michigan legislature approved the use of above-ground storage of spent fuels "at or near" nuclear power generating facilities with NRC approval. Mich. Comp. Laws Sec. 325.491
 
 
 [2]
 The district court correctly ruled that it was without subject matter jurisdiction to consider plaintiffs' claims in No. 93-1646, and the case was properly transferred to this court. See Michigan v. United States, 994 F.2d 1197 (6th Cir.1993)
 
 
 [3]
 Petitioners' arguments appear to claim that portions of the NRC's 1990 rulemaking are invalid. We cannot reach this issue, however, because we find that petitioners should have asserted such a claim within the 60-day period allowed by the Hobbs Act. 28 U.S.C. Sec. 2344
 Petitioners argue that this claim is only now ripe for review because the new NRC rule became a concrete action as applied to them in 1993. Reno v. Catholic Social Servs., Inc., --- U.S. ----, ---- - ----, 113 S.Ct. 2485, 2488-89, 125 L.Ed.2d 38 (1993); Lujan v. National Wildlife Fed'n, 497 U.S. 871, 891, 110 S.Ct. 3177, 3190, 111 L.Ed.2d 695 (1990). These cases do not, as petitioners assert, establish that petitioners' claims have become viable only since the NRC's 1993 acts. In Lujan, the Supreme Court found that in the absence of a specific authorization in the "substantive statute," a person claiming a right to sue under the general provisions of the Administrative Procedure Act must establish that he is adversely affected or aggrieved by agency action. Lujan, 497 U.S. at 891, 110 S.Ct. at 3190. In this case, a specific statute does articulate the period during which action can be taken. Specific statutory authorization, not the general provisions of Sec. 702, prevails. Reno sets forth the requirement that some concrete action establish a petitioner's claim in a regulatory proceeding. Reno, --- U.S. ----, ----, 113 S.Ct. 2485, 2496, 125 L.Ed.2d 38 (1993). Even in that case, however, the Court noted that "[i]n some cases, the promulgation of a regulation will itself affect parties concretely enough to satisfy [the] requirement" of ripeness. Reno, --- U.S. at ----, 113 S.Ct. at 2495 (citing Abbott Labs. v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). In this case, the NRC's 1990 rule had an immediate impact. After promulgation of the rule, the very procedures about which petitioners now complain were in place, and any civilian reactor in the nation, including Palisades, was free to use the approved storage systems.
 In addition, petitioners cite Edison Elec. Institute v. EPA to establish that " 'the period for seeking judicial review may be made to run anew when the agency in question by some new promulgation creates the opportunity for renewed comment and objection.' " Edison, 996 F.2d 326, 331 (D.C.Cir.1993) (quoting Ohio v. EPA, 838 F.2d 1325, 1328 (D.C.Cir.1988)). See also Public Citizen v. Nuclear Regulatory Comm'n, 901 F.2d 147, 151 (D.C.Cir.) (holding that agency's decision to reconsider a rule three years after it was first promulgated prompted a new period for judicial review), cert. denied, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990). These cases, however, have no bearing on our consideration of petitioners' claim. Edison and Public Citizen involved reconsideration of agency regulations and agency attempts to set forth alternative approaches to prior established regulations. The so-called reopener doctrine applied in these cases is not required here. The NRC has not reconsidered the propriety of its grant of a general license. Moreover, it is not making drastic changes that have the effect of restructuring its earlier rules. It is merely adding a new form of storage cask to its list of approved systems.
 
 
 [4]
 Petitioners point to the NRC's language in the notice of exemption as evidence of the specificity of the NRC's decision. That notice provided:
 The alternative would ... delay the availability of these casks to Consumers Power Company and cause the Palisades plant to operate without full core discharge capability at the start of the next fuel operating cycle.... Lack of full core discharge would have adverse consequences on the licensee's operating schedule, should such a need arise.
 
 
 [56]
 Fed.Reg. 41,870. This language does not establish petitioners' claim. The NRC was clearly aware of the pressing nature of Consumers' need for additional storage facilities. This language, by itself, however, does not demonstrate any findings with regard to the Palisades plant or its technical operations that might have affected the NRC decision. Any other reactor might have been experiencing the same urgent needs that Palisades faced and the name of that reactor could be substituted on the NRC's notice without changing the meaning of the language. The only site-specific aspect involved is that Palisades happened to need the casks sooner than any other reactor
 
 
 [5]
 The regulations at 40 C.F.R. were prepared by the Council on Environmental Quality and are "grant[ed] 'substantial deference' as the authoritative guide for NEPA's interpretation." California v. Block, 690 F.2d 753, 763 (9th Cir.1982) (quoting Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979))
 
 
 [6]
 The Atomic Energy Commission ("AEC") was the predecessor agency to the NRC